ATTORNEYS FOR RELATORS
Thomas R. Ruge
Todd A. Richardson
Suzanne L. Robinson
Indianapolis, Indiana

Stephen Carter
Attorney General of Indiana

Gary Secrest
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
Karl L. Mulvany
Nana Quay-Smith
Indianapolis, Indiana

ATTORNEY FOR RESPONDENT
Patrick F. O'Leary
Goshen, Indiana

_____

# In the
# Indiana Supreme Court

_____

No. 94S00-0312-MS-589


STATE OF INDIANA EX REL. INDIANA STATE BAR ASSOCIATION
AND ATTORNEY GENERAL FOR THE STATE OF INDIANA,

*Relators*,

v.

LUDY DIAZ,

*Respondent*.

_____

On Petition To Enjoin The Unauthorized Practice Of Law

_____

**December 6, 2005**


**Per Curiam.**

This is an original action brought by the Indiana State Bar Association and the Attorney General for the State of Indiana (together "Relators") in the name of the State of Indiana pursuant to Indiana Admission and Discipline Rule 24.[1]  Relators seek an order enjoining Respondent, Ludovina Emila Diaz ("Diaz"), who does business under the name Ludy Diaz, from the unauthorized practice of law.  This Court has original and exclusive jurisdiction over matters involving the unauthorized practice of law.  *See* IND. CONST. art. 7, § 4; Ind. Code § 33-24-1-2(b)(2) (2004).  The Court finds Diaz has engaged in acts constituting the unauthorized practice of law and concludes an injunction is appropriate and necessary.

**Procedural Background**

On December 1, 2003, Relators filed a verified petition to enjoin Diaz from the unauthorized practice of law ("Petition"). The Petition alleged Diaz engages in the unauthorized practice of law by:  (a) selecting and completing immigration forms for individuals seeking immigration assistance; (b) advising individuals on immigration matters; (c) giving advice that is legal in nature and exceeds filling in blanks on a legal document; (d) using the title "Notario" or "Notario Publico," which is inherently misleading to Spanish speaking people; and (e) advertising and promoting her services without disclaiming she is not an attorney.  The Petition seeks to enjoin Diaz from:  (1) selecting immigration forms for individuals seeking immigration assistance; (2) advising individuals on immigration or other legal matters; (3) using the title "Notario" or "Notario Publico;" and (4) advertising, affirmatively self promoting, or calling to public attention her services without disclaiming she: (i) is not an attorney; (ii) cannot tell individuals what immigration forms they need; (iii) cannot tell individuals which immigration benefits they may be eligible for; and (iv) cannot give advice on how to complete an immigration form.

---

[1] Rule 24 states, in part:  "Original actions . . . to restrain or enjoin the unauthorized practice of law in this state may be brought in this court by the attorney general . . . the Indiana State Bar Association or any duly authorized committee thereof, without leave of court . . . ."

2

Diaz filed a verified return denying most of the material allegations in the Petition. This Court appointed the Honorable Jenny Pitts Manier, a judge of the St. Joseph Superior Court, as Commissioner to hear the evidence in this case and to provide the Court with detailed findings of fact. Trial was held on September 13, 2004. The Commissioner filed her findings of fact on October 6, 2004. The Court then received briefs from the Relators and Diaz, as well as an amicus curiae brief from the Consulado de Mexico en Indianapolis in support of the Relators.

### A Brief Summary Of Immigration Law

Various agencies and players. As of March 1, 2003, the effective date of the Homeland Security Act of 2002, the Immigration and Naturalization Service ("INS") was abolished and its functions were transferred to the Department of Homeland Security. Under the Deputy Secretary of Homeland Security is the Bureau of U.S. Citizenship and Immigration Services ("USCIS"), and under the Undersecretary of Border and Transportation Security are the Bureau of Immigration and Customs Enforcement ("ICE") and the Bureau of Customs and Border Protection. *See* Richard D. Steel, Steel on Immigration Law, § 2:1 (2d ed. 2004) (available at Westlaw database "STEEL").

ICE assumed the enforcement jurisdiction and role of the former United States Customs Service and those functions of the former INS involved in investigations, detention, and removal. *See* id. § 2:3. The USCIS assumed many of the adjudicatory functions of the former INS, including such matters as visa petitions, applications for adjustment to permanent status, applications for waivers, and applications for asylum. *See* id. § 2:2.

The Executive Office of Immigration Review is subject to the supervision of the Attorney General and is headed by a director who is responsible for supervising the Board of Immigration Appeals ("BIA") and the Office of the Chief Immigration Judge. *See* id. § 2:5. The BIA is the appellate body charged with the review of administrative adjudications under the Immigration and Nationality Act (the "Act"). *See* id. The Chief

3

Immigration Judge is responsible for the supervision of immigration judges, who conduct exclusion and deportation hearings and other proceedings the Attorney General may assign them to conduct. *See* id. § 2:8.

Aliens seeking to remain in the United States. Among the grounds an alien may assert to remain in the United States are: (1) the alien has a relative who is a citizen or permanent resident of the United States (a "family-based" or "relative" petition), *see* 8 U.S.C. § 1153(a) (2000); (2) the alien has employment skills needed in the U.S. (an "employment-based" petition), *see* 8 U.S.C. § 1153(b) (2000 & Supp. 2002); and (3) the alien has fled his or her country of citizenship due to the fear of political persecution (a petition for asylum), *see* 8 U.S.C. § 1158 (2000 & Supp. 2002).

In specifying the qualifying relationships for a family-based petition, the Act uses words of otherwise common meaning but which in this context are subject to significant statutory, judicial, and administrative definition and interpretation. *See* Steel, *supra*, § 5:1. Most, but not all, relative petitions are filed on a Form I-130. *See* id. § 5:32.

The availability of visas to persons who qualify as relatives can be limited by several factors, including quotas. *See* id. § 4:2. When a quota applies, the alien is assigned a priority date, which establishes the person's place in the waiting line. *See* id. § 4:17. Monitoring one's progress in the line is done through consulting the monthly Visa Bulletin issued by the Department of State. *See* id. § 4:18. Approval of a relative visa petition does not guarantee the beneficiary will receive permanent resident status. The beneficiary still must apply for permanent residence through the USCIS and show he or she is not inadmissible to the United States. *See* id. §§ 4:8 & 5:42. Grounds for inadmissibility include convictions of certain crimes, fraud or misrepresentation of fact to obtain admission into the U.S., falsely claiming U.S. citizenship, entering as a stowaway, and having been previously ordered removed. *See* 8 U.S.C.A. § 1182(a)(2), (6) & (9) (West 1999 & Supp. 2005).

4

"Adjustment of status" is a procedure by which certain aliens physically present in the United States can obtain permanent resident status without leaving the United States. *See* Steel, *supra*, § 7:1. Form I-485 is the basic application for adjustment of status. *See* id. § 7:23. In some cases, an application for adjustment of status may be filed concurrently with a visa petition, but in other cases, as when the applicable quota is not current, the visa petition must be filed first. *See* id. § 7:24. Some requirements for adjustment of status were temporarily suspended for certain aliens if the underlying qualifying application or petition was filed on or before April 30, 2001. To take advantage of this provision, the alien must submit a Supplement A to the Form I-485 and, with some exceptions, pay a filing fee of $1,000.[2] *See* id. §§ 7:9 & 23.

The initial interview of an immigration client and the other parties involved is a crucial stage of the case and ascertaining all relevant facts is essential. Adequate communication must be established, especially if the client does not speak English. It is essential to ensure only true documentation is utilized and to advise the client of the consequences of using fraudulent documentation. Many times a problem arises because a person lied or used false documentation when the truth or true documentation would have been sufficient. *See* id. § 1:7.

Non-attorney representation. Federal law allows for limited non-attorney practice of immigration law in administrative proceedings. *See* 8 C.F.R. § 292.1 (2005). To qualify to practice as an "accredited representative," an individual must first be affiliated with an organization recognized by the BIA as a "non-profit religious, charitable, social service, or similar organization" that charges individuals only nominal sums for assistance rendered and has at its disposal adequate knowledge, information, and experience. 8 C.F.R. § 292.2(a) (2005). Second, the organization must petition on behalf of the individual, including in its application detailed information on the individual's "experience and knowledge of immigration and naturalization law and procedure . . . ." 8 C.F.R. § 292.2(d) (2005). If the petition is approved, the individual is legally allowed to

---

[2] The forms discussed above and accompanying instructions are available on the USCIS website (http//uscis.gov).

practice immigration law before the BIA (also called "the Board") and/or various bureaus ("the Service"). Such practitioners are subject to rules of professional conduct and discipline. *See* 8 C.F.R. § 292.3 (2005).

The "practice" of immigration law is defined as:

the act or acts of any person appearing in any case, either in person or through the preparation or filing of any brief or other document, paper, application, or petition on behalf of another person or client before or with the Service, or any officer of the Service, or the Board.

8 C.F.R. § 1.1(i) (2005).

The practice of immigration law does not include merely helping someone fill in blank spaces on forms for nominal remuneration, as long as the person offering assistance does not hold himself or herself out as qualified in legal matters or in immigration or naturalization procedure. *See* 8 C.F.R. § 1.1(k) (2005). However, the selection of the proper form is a different matter:

[The] selection by a visa consultant of a Form I-130 for a client's use could constitute a legal judgment that the client and/or his alien relatives are not eligible to apply for any other immigration benefit(s). An accurate determination of such eligibility requires extensive knowledge of often complex immigration laws and their applicability to individual cases.

. . . .

By selecting a Form I-130 for a lay client, translating it, transcribing the responses, and then assisting in securing supporting documentation, a visa consultant implicitly suggests to a client that this is the form that will best satisfy the request of securing legal immigration status for his or her relatives.

INS Gen. Couns. Op. No. 93-25, 1993 WL 1503972 (Apr. 20, 1993). Non-lawyers who are not accredited representatives (and fail to qualify under other nonlawyer categories), but nevertheless practice immigration law, are in violation of federal rules. *See* 8 C.F.R. § 292.1 (2005).

6

**Findings Of Fact**

Although Diaz challenges a number of the Commissioner's findings and offers different accounts of some events, the Court finds the Commissioner's findings are supported by clear and convincing evidence and hereby adopts them.[3]   The Commissioner's findings of fact ("Findings") are summarized below.

Diaz's background and business generally.  Diaz was born in Puerto Rico and moved to Indiana when she was 14 or 15 years of age.  She is fluent in both English and Spanish.  Diaz graduated from high school in Indiana, after which she attended cosmetology school.  Diaz has been appointed and commissioned as a notary public by the State of Indiana, but she does not have a law degree and is not licensed to practice law in Indiana or any other jurisdiction in the United States.  Neither Diaz nor her business has ever been certified to represent persons before the INS, the USCIS, the ICE, or the BIA.  (*See* Findings 6-12.)

Diaz does business as a sole proprietorship at offices located at 125 East Lincoln, Goshen, Indiana.  Diaz identified her occupation as "immigration counselor" on the federal income tax returns she filed for tax years 1996 through 2002.  After Relators filed their verified petition against Diaz, she identified her occupation as "translation services" on her 2003 federal income tax return.  Diaz has attended two seminars on immigration law. The first, a two-day immigration law seminar in Omaha, Nebraska, was put on by Catholic Charities, and the second, a one-day workshop on immigration law, was held in Chicago.  Diaz uses software from which she can generate immigration applications and other immigration forms. This software is updated periodically through a subscription service.  Diaz relies on this software to learn about changes in immigration law.  (*See* Findings 14, 20, 22.)

---

[3] The burden of proof in an action charging the unauthorized practice of law is not specified by rule.  *See* Admis. Disc. R. 24.  The burden of proof in attorney discipline cases and judicial discipline cases is clear and convincing evidence.  *See* Admis. Disc. R. 23, § 14(h); Admis. Disc. R. 25(VIII)(K)(6).  We need not decide today whether a standard lower than "clear and convincing" should apply in unauthorized practice of law cases because the evidence against Diaz satisfies the "clear and convincing" standard.

Diaz has been in business for herself for about seven years. Prior to opening her business, Diaz worked for La Casa of Goshen ("La Casa") from 1965 until 1978, and again from 1985 until 1995. Diaz's title while at La Casa was "immigration specialist." (*See* Finding 19.) La Casa is a social service agency operating in Elkhart County, Indiana, that is authorized to practice before the BIA and USCIS. As a part of achieving accredited status, La Casa was required to have a resource library and attorney resources available to it. (*See* Findings 106, 110-11.) It does not appear that Diaz was ever certified as an "accredited representative" of La Casa to practice before the BIA and USCIS, *see* 8 C.F.R. §§ 292.1(a)(4), 292.2(d). (*See* Diaz Dep. at 97-98, 152.)

Diaz's use of the titles "notary public" and "notario publico." The literal translation of the English words "notary public" are the Spanish words "notario publico." As described in more detail below, the term "notario publico" or "notario," as used in Mexico and other Latin American countries, however, indicates an official who is an experienced lawyer who has passed additional rigorous examinations. (*See* Findings 180-81.)

The awning outside her office is imprinted with the following text: "Ludy Diaz, Notary Public." Her Notary Public commission hangs, framed, on the wall of her office. Prior to the filing of the Petition, Diaz used a business card advertising her business in Spanish. The business card used the designation "Notario Publico" twice and did not advise whether or not Diaz was a lawyer. Diaz no longer uses the term "Notario Publico" on her business cards. (*See* Findings 15-16, 190-91.)

Prior to the filing of the Petition initiating this proceeding, Diaz had advertised her business in El Puente, a Spanish language publication in Elkhart County. This advertisement designated her as a "Notario Publico" providing "Servicios de Immigration" (immigration services). The advertisement stated Diaz had 17 years of experience and warranted absolute confidentiality. Diaz acknowledges the advertisement could have been used by her in the year 2002. The advertisement contains no disclaimer

8

advising that Diaz is not an attorney. Diaz ran a similar advertisement in 2001 in La Prensa, a Spanish language publication in Elkhart County. (*See* Findings 188-89.)

Diaz corrects persons whom she hears refer to her as an attorney by stating "I am not an attorney, I am a notary public," but it is unclear whether this correction is made in English, Spanish, or both. (*See* Finding 192.)

The Neighborhood Christian Legal Clinic ("NCLC") is a non-profit corporation offering pro bono legal representation and education to low-income inner city and Latino clients operating within the Indianapolis metropolitan area. NCLC clients have experienced problems with notaries holding themselves out as "notarios" in the areas of immigration, real estate, and tax law. The services these notaries provide are often deficient. The Mexican Consul in Indianapolis has received numerous complaints from individuals who have been confused by persons using the term "notario publico." There is, however, no evidence the NCLC or the Mexican Consul in Indianapolis ever received a complaint or inquiry concerning Diaz. (*See* Findings 186-87, 194-201.)

The scope of immigration services provided by Diaz. Diaz provides immigration services not only to Spanish speakers, but also to English speakers, non-Spanish speakers and other individuals who do not require translations or interpretations. Diaz selects the immigration forms she believes are appropriate to address the particular need of the individual client. Diaz's immigration services have involved preparation of family-based immigration petitions, an occasional employment-based petition, at least one asylum appeal, and applications for becoming a naturalized U.S. citizen. Diaz explains to her clients the process by which USCIS may waive certain conditions that would otherwise bar approval of an alien's immigration application. In some instances, Diaz has accompanied her clients to the immigration office. (*See* Findings 133-37.)

Diaz has advised clients on such issues as seeking citizenship for minor children, visa priority dates, the implications of being married for less than two years, the procedure to follow if one does not fall within any of the eight bases listed on form I-485

9

for which an adjustment to status may be sought, status adjustment based on having a relative who becomes a U.S. citizen, and the process for completing employment-based immigration petitions. (*See* Findings 150-54.)

Diaz uses form letters, prepared by her, in connection with immigration cases. She writes letters for clients that attempt to serve as notices of appeal, motions to reopen cases closed or denied by the USCIS, requests for the withholding of deportation, and letters of explanation concerning previous deportations. Diaz's letters are generally in the nature of a "shot in the dark" or an appeal for mercy. Diaz does not know the legal requirements for appealing an immigration decision or the circumstances under which an appeal may be granted. There is no evidence Diaz advises her clients of this fact. Diaz does not know whether the contents of her letters will be helpful to her clients with their immigration matters. Diaz does not know the circumstances under which a deportation will be withheld. Diaz does not know how criminal convictions are treated by immigration officials. (*See* Findings 138-46.)

Diaz refers clients to attorneys when she feels she cannot handle their cases, when they must appear in court, or when immigration specifically states the client needs to be represented by an attorney. (*See* Finding 168.)

Diaz charges a fee for assisting and advising individuals regarding immigration matters. The fee for her services is based upon how many forms are used and whether or not any translation is required. Diaz advises her clients as to what she expects the immigration filing fees to be. After the applications are completed, Diaz tells clients how much money needs to be sent to the immigration office and that the client will need to get that amount in a cashiers check or money order. Diaz does not maintain a separate trust account for money that is given to her by clients for the purpose of paying a filing fee, obtaining a money order or paying postal expenses. Diaz keeps track of the money that flows in and out of her office by writing receipts. (*See* Findings 156-63.)

Diaz's dealings with Anjelica Hernandez and Fructuoso Espinoza Rivera. Anjelica Hernandez ("Hernandez") is a citizen of the United States who describes her ethnicity as Hispanic. She is fluent in both Spanish and English. Hernandez married Fructuoso Espinoza Rivera ("Espinoza") on March 25, 2000, and they have one child, born December 7, 2001. Hernandez also has another child, born October 4, 1998, who is not Espinoza's biological child, but who views Espinoza as a father. (*See* Findings 40-45.)

Espinoza is a citizen of Mexico. Espinoza attempted to enter the United States in early 1998 by falsely claiming U.S. citizenship using the birth certificate of another person who was in fact a citizen of the United States. Espinoza was subjected to expedited removal proceedings at that time, an administrative removal order was issued, and he was returned to Mexico. Espinoza married Hernandez after a subsequent illegal entry into the United States. At the time of the marriage, Hernandez was aware that Espinoza was residing in the United States illegally and that he had been previously deported or removed from the United States for attempting to enter the United States using the birth certificate of another person. (*See* Findings 48-51.)

Hernandez and Espinoza wished to secure legal U.S. resident status for Espinoza. Hernandez knew of Diaz because members of Hernandez's family had previously hired Diaz to assist them with immigration matters and Hernandez had seen advertisements in a local Spanish-language newspaper advertising Diaz's services. Hernandez did not know what title, qualification or certification, if any, Diaz held, but she understood Diaz to be an immigration expert. (*See* Findings 52-55, 94.) Hernandez, therefore, scheduled an appointment for herself and Espinoza with Diaz in May 2000. Hernandez was told to bring with her to the appointment a filing fee of $130 and the $100 fee Diaz would be charging for her services. (*See* Findings 52-57.)

At the appointment, Hernandez explained to Diaz that Espinoza was in the U.S. illegally, that they had just married, and that they were seeking to obtain residency status for Espinoza. Diaz advised Hernandez and Espinoza that Diaz would fill out the

11

appropriate application and send it to the INS.  Diaz spoke in English and in Spanish during the meeting.  Diaz asked if Espinoza had any other relatives who were U.S. citizens.  Diaz did not ask Hernandez or Espinoza about any other immigration filings they previously may have made.  Diaz did not ask whether Espinoza previously had been deported or removed from the United States and neither Hernandez nor Espinoza volunteered that information.  Diaz selected and prepared for Espinoza a Form I-130, Petition for Alien Relative.  In completing the Form I-130, Diaz asked about Espinoza's work history.  Diaz advised Hernandez and Espinoza it would be better to indicate on the form that Espinoza was working as a seasonal worker for cash, rather than to acknowledge that he was working under someone else's authorization or status. Hernandez and Espinoza were not advised in detail as to the significance of the form completed by Diaz, were not asked to review it, and were not provided with a copy of the completed form.  After Espinoza signed the form, Diaz advised Hernandez and Espinoza that she, Diaz, would finish the form and mail it to the INS.  Hernandez tendered to Diaz $130 for the filing fee and $100 for Diaz's services, for which Hernandez was given a receipt.  (*See* Findings 61-70.)

Hernandez later came to believe that a new program existed whereby illegal immigrants would be permitted to gain lawful residency status simply by paying a fine.[4] Hernandez contacted Diaz's office for a second time, spoke with a young woman who advised Hernandez of the cost, told Hernandez to bring the filing fee with her, and scheduled an appointment for a date about thirty days later.  At this appointment, Hernandez explained to Diaz what she had heard about a new program and explicitly questioned Diaz as to whether Espinoza would be eligible for this benefit notwithstanding his earlier deportation.[5]  Diaz completed a Form I-485, Application to Register Permanent Resident or Adjust Status.  Diaz spoke to Hernandez in Spanish and English

---

[4]This may have been the temporary suspension of some requirements for adjustment of status that applied to qualifying applications or petitions filed on or before April 30, 2001.  *See* Steel*, supra*, § 7:9.

[5] Diaz testified that neither Hernandez nor Espinoza told her about Espinoza's deportation or his use of false documents.  The Commissioner found Hernandez's testimony to be more credible.  (*See* Finding 71.) Even if Diaz's version of events is correct, however, it would not change this Court's conclusion that Diaz engaged in the unauthorized practice of law.

as she completed this form. Diaz gave neither Hernandez nor Espinoza information as to the purpose of the Form I-485. Hernandez, however, trusted Diaz and had the impression Diaz knew what she was doing. Diaz did not give Hernandez or Espinoza a copy of the Form I-485 when they left the office. Diaz did not ask them to review the form prior to having Espinoza execute it, or thereafter. Diaz instructed Espinoza to sign the form, even though she had additional work to do to complete the form. Hernandez did not know at that time that the answer to one question incorrectly indicated that Espinoza had never been deported or removed from the U.S. Hernandez and Espinoza paid Diaz $200 for the services provided by Diaz in connection with the completion of the Form I-485. (*See* Findings 72-79, 82.)

Hernandez returned to Diaz's office a few days later to pick up the completed Form I-485, which Hernandez mailed to the INS, with a check for $1,425, which she had been told by Diaz's receptionist was the required filing fee.[6] Hernandez mailed the Form I-485 herself, rather than having Diaz do so, because Hernandez and Espinoza believed Diaz was very busy and they did not want the processing of the application to be delayed. (*See* Findings 80-81.) After Hernandez retrieved the Form I-485 and mailed it to INS, Hernandez had no expectation that Diaz was assisting Espinoza further with the I-485 application. (*See* Finding 95.)

Espinoza and Hernandez attended an interview at the INS office in Indianapolis approximately six months after submitting the Form I-485. They were advised to submit materials to verify Espinoza's employment. Hernandez sent to INS a copy of Espinoza's pay stub without the assistance of Diaz. Espinoza and Hernandez returned a second time to the Indianapolis INS office to inquire about the status of the I-485 application and to renew his work authorization. They questioned Espinoza's INS caseworker about the status of his I-485 application. The caseworker questioned them about Espinoza's prior deportation. Hernandez and Espinoza explained to the INS caseworker the details of the prior deportation and that they had advised Diaz expressly of the deportation. Espinoza

---

[6] This apparently was intended to include a $1000 filing fee to accompany a Supplement A to Form I-485, a copy of which is included in Diaz's file for Espinoza. The Form I-485 Supplement A was signed on April 23, 2001.

and Hernandez were separated and Hernandez was then told Espinoza had been detained and would be deported.  Diaz had not warned Hernandez or Espinoza that this might occur.  (*See* Findings 83-87.)  Espinoza has not seen his child since his deportation.  (*See* Finding 101.)

After Espinoza was detained, Hernandez contacted Diaz but did not advise Diaz about Espinoza's detention.  Hernandez asked Diaz for copies of the documents completed by Diaz for Espinoza and told her they were seeking legal assistance due to the delay in processing Espinoza's I-485 application.  Diaz advised Hernandez to just "send a letter" and that a lawyer "would charge a lot of money and it would not do any good."  Hernandez  eventually obtained from Diaz a copy of the file Diaz maintained for the services she provided to Espinoza.  (*See* Findings 88-90.)

Diaz did not recognize at the time she assisted Espinoza that his prior use of false documentation in connection with an immigration matter was a serious offense.  It would have been predictable to a person in the practice of immigration law that the filing of the Form I-485 for Espinoza would have lead to negative consequences for him.  (*See* Findings 98-100.)

Services Diaz provided to other clients.  The record shows Diaz provided immigration services far beyond mere translation assistance and Diaz provided services in legal fields besides immigration.  (*See* Findings 120-32.)  We will briefly summarize those services here.  She completed immigration applications for individuals who do not speak the Spanish language.  (*See* Finding 120.)  She composed letters for clients to send to the USCIS seeking action on pending immigration matters.  (*See* Findings 121-22.)  She composed letters for an applicant and the applicant's father expressing the applicant's remorse and the father's apology for an offense committed by the applicant as a juvenile, even though a juvenile adjudication is not a conviction for immigration purposes.  (*See* Finding 123.)  She prepared a Notice of Appeal to the BIA following a decision to deny one of her clients an asylum application, issued checks to the U.S. Department of Justice in connection with this appeal, and composed a letter seeking the

14

withholding of the deportation of the client. (*See* Finding 124.) She assisted a client, born in the United States, with an immigration application for his wife, who had entered the United States without permission, but did not advise the client about the consequences of his wife's leaving the United States and trying to re-enter using false documents while her immigration petition was pending, resulting in the wife's being apprehended at the border and returned to Mexico when she tried to do so. (*See* Finding 127.) She completed a Form I-485, Petition for Adjustment of Status, for a client, indicating her current nonimmigrant status as "I-130 approved," even though she had entered the United States as a stowaway. (*See* Finding 125.) She assisted a married couple in connection with the I-130 immigration petition filed on behalf of the wife, and later, when the parties separated and planned to divorce, composed a letter to immigration officials, executed by the husband and notarized by Diaz, requesting that processing of the I-130 petition be halted. (*See* Finding 130.) She drafted various forms of a contract between individuals for the purchase and sale of a mobile home, including a form or agreement written in Spanish. (*See* Finding 124.) She drafted an answer to a complaint for a client, which was filed in the Elkhart Superior Court. (*See* Finding 123.) She drafted a single Last Will and Testament for two clients, which was not properly executed. (*See* Finding 131.)

## The Unauthorized Practice Of Law

This Court's authority to set standards for and to supervise the practice of law emanates from the need to protect the public from those who are not properly licensed or otherwise qualified to act as attorneys. *See* State ex rel. Disciplinary Comm'n v. Owen, 486 N.E.2d 1012, 1014 (Ind. 1986). The practice of law without a license is not a "victimless crime" because the legal interests of people assisted by those who are not qualified to act as attorneys can be irreparably damaged. *See* State ex rel. Indiana State Bar Ass'n v. Miller, 770 N.E.2d 328, 331 (Ind. 2002) (Shepard, C.J., dissenting). This is especially true in immigration cases, where the consequences of incompetent representation may be the lost opportunity for permanent residence, deportation, and perhaps even death for unsuccessful asylum seekers.

15

It is the province of this Court to determine what acts constitute the practice of law. *See* In re Mittower, 693 N.E.2d 555, 558 (Ind. 1998). This Court has not attempted to provide a comprehensive definition of what constitutes the practice of law because the infinite variety of fact situations each must be judged according to its own specific circumstances. *See* Miller v. Vance, 463 N.E.2d 250, 251 (Ind. 1984). Although there may be a "twilight zone" between those acts that are and those that are not permissible for persons who are not lawyers, *see* State ex rel. Indiana State Bar Ass'n v. Indiana Real Estate Ass'n, 244 Ind. 214, 217, 191 N.E.2d 711, 715 (1963), it is clear the core element of practicing law is the giving of legal advice to a client. *See* Owen, 486 N.E.2d at 1013. In fact, merely entering into such relationship constitutes the practice of law. *See* id. The practice of law includes making it one's business to act for others in legal formalities, negotiations, or proceedings. *See* Mittower, 693 N.E.2d at 558. In addition, holding oneself out as an attorney by the use of misleading labels, such as "esquire," when one is not licensed to practice law may constitute the unauthorized practice of law. *See* id.

This Court has had occasion to address whether assisting persons in filling out documents with legal ramifications constitutes the practice of law. In State ex rel. Indiana State Bar Ass'n v. Indiana Real Estate Ass'n, the issue presented was whether licensed real estate brokers and salespersons were engaged in the unauthorized practice of law when they used form legal documents prepared by attorneys, selected which forms to be used, and inserted words within the printed forms in connection with the real estate transactions. *See* 244 Ind. at 217, 191 N.E.2d at 713. This Court stated:

> Generally, it can be said that the filling in of blanks in legal instruments, prepared by attorneys, which require only the use of common knowledge regarding the information to be inserted in said blanks, and general knowledge regarding the legal consequences involved, does not constitute the practice of law. However, when the filling in of such blanks involves considerations of significant legal refinement, or the legal consequences of the act are of great significance to the parties involved, such practice may be restricted to members of the legal profession.

244 Ind. at 220, 191 N.E.2d at 715. The Court then assessed the potential for errors by nonlawyers and the practicalities of the situation:

16

We are aware of the dire consequences which might, in isolated instances, result from the use of an improper form, by persons not skilled in law, but such speculative consequences cannot be made to outweigh the practicalities of the situation.

. . . . It cannot be urged, with reason, that a lawyer must preside over every transaction where written legal forms must be selected and used by an agent acting for one of the parties. Such a restriction would so paralyze business activities that very few transactions could be expeditiously consummated. . . . The possibility of an occasional improvident act in the use of such forms may not, with reason, be made the basis for denying the right to perform the same act in a thousand instances where the public convenience and necessity would seem to require it. Lawyers, themselves, on rare occasions have been known to make errors in the drafting of such forms.

The legislature has . . . recognized that the real estate brokers and salesmen perform an approved function in our business society, and has established a procedure whereby their qualification is ascertained. No issue has been raised as to the sufficiency of this examination. By this method, the legislature has attempted to establish reasonable standards for the safeguard of the public in their real estate transactions. We consider it expedient that we attempt a reconciliation of the overlapping services performed by the real estate brokers and members of the bar.

244 Ind. at 221-22, 191 N.E.2d at 715-16. The Court concluded the execution of deeds is restricted to attorneys but real estate brokers and salespersons may fill in the forms of other legal instruments prepared by attorneys, including listing agreements, offers to purchase, purchase agreements, and short form leases. *See* 244 Ind. at 226, 191 N.E.2d at 717.

In <u>Miller v. Vance</u>, this Court considered whether the preparation of a mortgage instrument by a bank employee who was not an attorney constituted the unauthorized practice of law. *See* 463 N.E.2d at 251. This Court reasoned:

The instant case . . . involves the lay employees of banks performing the routine service of filling in information on standard real estate mortgage forms. This service is incidental to and directly connected with the bank's regular business of making loans. The bank employees here were involved in preparing documents for routine business transactions with which they were thoroughly familiar in the same manner in which real estate brokers were involved in preparing documents

17

routinely associated with their real estate transactions. While it is true that the preparation of mortgage instruments might be classified as the practice of law in some circumstances, that is not the case here.

Id. at 252. The Court, however, cautioned:

> We emphasize that there are certain limitations which apply to bank employees similar to those placed upon real estate brokers. . . . The lay bank employee may not give advice or opinions as to the legal effects of the instruments he prepares or the legal rights of the parties. The bank may not make any separate charge for the preparation of the mortgage instrument.

Id. at 253.

Thus, in both Indiana Real Estate and Miller, the Court permitted nonlawyers to fill out legal forms in situations in which the chance for legal error was low. The forms were used in routine transactions in the course of the jobs for which the nonlawyers were trained in Miller and for which the nonlawyers were both trained and licensed in Indiana Real Estate, and the forms were prepared by lawyers for use in such transactions.

## Immigration And Other Services Provided By Diaz

Diaz's use of immigration forms is not analogous to the use of forms by non-lawyers permitted by this Court in Indiana Real Estate and Miller. Immigration services cannot be considered "routine transactions." Rather, each case is unique and the procedures can be complex. The choice of a form and the information to include in its blanks can turn on subtle facts that may not be apparent to those without legal training.

Moreover, Diaz's immigration services went far beyond the use of forms. She held herself out as providing immigration services. She advised clients on many aspects of immigration law, she wrote letters, motions, and appeals to immigration officials on behalf of clients, and she accompanied clients to the immigration office. Beyond immigration law, she ventured into drafting contracts, a pleading, and at least one will. In many cases, her understanding of the underlying law was incomplete, her advice or the documents she prepared were faulty, and her clients suffered.

18

The Court also notes that Diaz promised absolute confidentiality to her clients. However, because she is not an attorney, the sensitive information her clients disclose to her regarding their immigration status and other matters is not protected by the attorney–client privilege. The fact that she promised such confidentiality further suggests she was holding herself out as a "notario," rather than a "notary," discussed in more detail below.

The Court is cognizant of the unmet needs of immigrants, particularly those from Latin America, for aid with immigration problems and procedures. Because of the high poverty rate of recent immigrants and the dearth of affordable legal counsel, an estimated fifty to eighty percent of all non-citizens have unmet legal needs. *See* Anne E. Langford, Note, *What's In A Name?: Notarios In The United States And The Exploitation Of A Vulnerable Latino Immigrant Population*, 7 Harv. Latino L. Rev. 115, 118 (2004). According to a study of the civil legal problems among low-income, foreign-born households, one in five Latino immigrants reported having sought help for a legal issue from a non-attorney immigration consultant, many of whom use the misleading title of "notario publico." *See* id. at 122. The study noted a disproportionate use of "notarios" by those whose immigration status was most precarious, including undocumented immigrants and asylum-seekers. *See* id. at 123.

The answer to these unmet needs, however, is not permitting unqualified practitioners to provide inadequate services. Incompetence in the complexities of immigration law can have disastrous results because filing the wrong document, missing a deadline, or misjudging the relief available to a client can mean the difference between legal status and deportation (which, for asylum seekers, may carry the risk of death if returned to their native lands). *See* id. Although some non-attorneys may provide competent and welcome services to immigrant communities, *see* id. at 125, without any licensing or oversight of non-attorney practice, clients must trust to luck when using such services.

It was perhaps in response to the vast unmet legal needs of immigrants that federal law now allows for non-attorney "accredited representatives" associated with qualified non-profit organizations to practice immigration law before BIA and the Service. *See* id. at 126; 8 C.F.R. § 292.2 (2005). La Casa is such an organization. But while accredited representatives are not lawyers, they are subject to qualification requirements based on their experience and knowledge of immigration and naturalization law and procedure, they are subject to federal rules of professional conduct and discipline, and the organization for which they work must have at its disposal adequate knowledge, information, and experience. *See* 8 C.F.R. §§ 292.2 & 292.3 (2005). Although a state may not interfere with the federal government's authority to permit non-lawyers to practice before its agencies, a state "maintains control over the practice of law within its borders except to the limited extent necessary for the accomplishment of the federal objectives." Sperry v. Florida ex rel. Florida Bar, 373 U.S. 379, 402 (1963). This Court expresses no opinion on whether any of the services offered by La Casa or those who work for La Casa may exceed the scope of their federal authorization and thus constitute the unauthorized practice of law in Indiana. The Court simply notes that Diaz does not offer services as an accredited representative under the auspices of a qualified non-profit organization. Her clients enjoy none of the protections such an arrangement offers and she may claim none of the privileges. Her practice of immigration law appears to be in violation of federal as well as state law.

**Diaz's Use Of The Titles "Notary Public" And "Notario Publico"**

The requirements to become a notary public in Indiana are not stringent. An applicant for a notary public commission must be at least eighteen years of age, a legal resident of Indiana, and must secure an official bond in the sum of five thousand dollars ($5,000). *See* Ind. Code § 33-42-2-1(a) & (e) (2004). No specific education or training is required. The notary public application, found on the website of Indiana's Secretary of State, is just four pages long, including instructions. *See* http://www.in.gov/icpr/webfile/formsdiv/40889.pdf. A notary's powers consist primarily of certifying acknowledgments of deeds and other legal instruments, administering oaths,

and certifying affidavits and depositions. *See* I.C. § 33-42-2-5 (2004). A notary public may charge no more than two dollars ($2) for each notarial act. *See* I.C. § 33-42-8-1 (2004).

By contrast, in many Latin American countries "notarios publicos" are a select class of elite attorneys, subject to rigorous examinations, regulation, and codes of professional responsibility, who perform quasi-judicial and other functions, including certifying and authenticating legal acts that they witness. *See* Langford, *supra*, at 116. Some notaries public in the United States have exploited Latinos' expectations about their functions and legal knowledge, creating an illusion of expertise to mislead those who depend on them. *See* id. Plying on the implicit misrepresentation of their credentials, some notaries charge excessive amounts for services that should be free or nominal in cost, in some cases destroying immigrants' ability to pay for legitimate legal assistance. *See* id. at 124. *See also* Milagros Cisneros, Legislative Development, *H.B. 2659: Notorious Notaries-How Arizona Is Curbing Notario Fraud In The Immigrant Community*, 32 Ariz. St. L.J. 287 (2000); Alexandra M. Ashbrook, Note, *The Unauthorized Practice Of Law In Immigration: Examining The Propriety Of Non-Lawyer Representation*, 5 Geo. J. Legal Ethics 237 (1991).

Indiana is not the first state to be confronted with the misleading use of "notary public" or "notario publico." *See, e.g.*, Florida Bar v. Lugo-Rodriguez, 317 So.2d 721 (Fla. 1975); McCarthy v. Panaccio, 49 Pa. D. & C.2d 501 (1969); Langford, *supra*; Cisneros, *supra*. By 1999, eleven jurisdictions had enacted legislation specifically aimed a curbing this practice. *See* Cisneros, *supra*, at 311. On July 1, 2001, the following Indiana statute took effect:

A person who:

(1) is not an attorney in good standing admitted to practice law in Indiana; and

(2) knowingly or intentionally:

21

(A) advertises the person's services in a language other than English;

(B) represents in the advertisement that the person is a notary, notary public, notario, notario publico, or another designation that indicates in a language other than English that the person is a notary public; and

(C) fails to conspicuously state in the advertisement, both in English and in the language of the advertisement, that the person is not an attorney in good standing admitted to practice law in Indiana;

commits a Class A misdemeanor.

I.C. § 33-42-2-10 (2004) (formerly I.C. § 33-16-2-10 (Supp. 2001), added by P.L. 64-2001, § 1).


None of Diaz's advertisements presented to the Commissioner contained the disclaimer required by the above statute. At least one of Diaz's advertisements could have been published after the effective date of the statute and thus would have been in violation of the statute. The statute notwithstanding, however, this Court finds Diaz's use of the title "Notary Public" or "Notario Publico" to be inherently misleading. One of her business cards contained the title not once, but twice. The title was prominently displayed after her name on the awning of her office. She displays her notary certificate prominently in her office, akin to the manner one might display a diploma. Although Diaz corrects people who refer to her as an attorney by telling them she is a notary public, not an attorney, there is no indication Diaz corrects any misperception those people might have about the authority that comes with that title in Indiana. There is no indication that any substantial part of Diaz's business involves legitimate services as a Notary Public, and the fees she charges for her services are far above those permitted for notarial acts. Under these circumstances, the Court concludes Diaz's use of the titles "Notary Public" and "Notario Publico" in advertisements, on business cards, on her office wall, and on her awning constitutes the unauthorized practice of law. *See* Mittower, 693 N.E.2d at 558 (holding oneself out as an attorney by the use of misleading labels may constitute the unauthorized practice of law).

22

**Conclusion, Injunction And Other Relief**

The evidence clearly established that Diaz has engaged in the unauthorized practice of law. This Court has jurisdiction to issue restraining orders and injunctions in cases involving the unauthorized practice of the law. *See* IND. CONST. art. 7, § 4; I.C. § 33-24-1-2(b)(2) (2004).

The Court therefore enjoins Diaz from:

(1) selecting immigration forms for individuals seeking immigration assistance;

(2) advising individuals both on how to fill in the blanks on immigration forms specifically and on immigration or other legal matters generally;

(3) using the title "Notario" or "Notario Publico";

(4) using the title "Notary" or "Notary Public" in advertisements (including business cards and displays outside and within her office) without a conspicuous disclaimer, in both English and Spanish, that she is not an attorney admitted to practice law in any jurisdiction;

(5) offering or providing any services to any client related to immigration without disclaiming, in English or Spanish (whichever is best understood by the client), that she: (a) is not an attorney; (b) cannot tell individuals what immigration forms they need; (c) cannot tell individuals which immigration benefits they may be eligible for; and (d) cannot give advice on how to complete an immigration form;

(6) drafting wills, contracts, pleadings, or other legal documents for clients; and

(7) permitting any person working for her to do any act in violation of this injunction.

This injunction does not prevent Diaz from providing clients with translation and other services that do not constitute the unauthorized practice of law, as long as clients are advised of the limits of Diaz's services consistent with the above injunction.

The costs and expenses of the hearing before the Commissioner shall be borne by Diaz. *See* Admis. Disc. R. 24.

SHEPARD, C.J., and DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.