

FILED

Nov 22 2016, 8:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE

Menes Ankh El
Greencastle, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Wendell Brown a/k/a Menes Ankh El, | November 22, 2016 |
| *Appellant-Defendant,* | Court of Appeals Case No. 49A05-1311-CR-550 |
| v. | Appeal from the Marion Superior Court |
| State of Indiana, | The Honorable Sheila A. Carlisle, Judge |
| *Appellee-Plaintiff.* | Trial Court Cause No. 49G03-1204-FC-25485 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Wendell Brown, now known as Menes Ankh-El[1] (Ankh-El), appeals his conviction for burglary, a Class C felony, Ind. Code § 35-43-2-1 (2011); forgery, a Class C felony, I.C. § 35-43-5-2(b) (2011); and driving while suspended, a Class A misdemeanor, I.C. § 9-24-19-2 (2012).

We affirm.

## ISSUES

Ankh-El raises five issues on appeal, which we restate as follows:

(1) Whether the trial court had subject matter jurisdiction over this case;

(2) Whether the trial court denied Ankh-El the right to counsel in violation of the Sixth Amendment to the United States Constitution;

(3) Whether the State presented sufficient evidence to support Ankh-El's conviction for burglary, forgery, and driving while suspended beyond a reasonable doubt;

(4) Whether the charging Information was defective; and

(5) Whether the trial court committed fundamental error by exhibiting prejudice.

---

[1] Ankh-El's briefs and other filings indicate that his surname is "Ankh El"; however, we will use the hyphenated spelling as it is written on Ankh-El's identification card, which is depicted in State's Exhibit 13.

## FACTS AND PROCEDURAL HISTORY

[4] In January of 2012, Bank of America acquired a foreclosed home located at 2401 West 39th Street, Indianapolis, Marion County, Indiana (the Property), through a sheriff's sale. Because Bank of America utilized Bank of New York Mellon to service its mortgage rights, Bank of New York Mellon is also listed on the Sheriff's Deed. The Sheriff's Deed was stamped by the Marion County Assessor on February 10, 2012, and filed with the Marion County Recorder on February 13, 2012.

[5] Shortly after procuring the Property, Bank of America engaged Integrated Asset Services "to manage, market, and sell the [P]roperty." (Tr. p. 148). Integrated Asset Services assigned the Property listing to one of its real estate brokers, Mark Forcum (Forcum). It was Forcum's responsibility to prepare, market, and sell the Property. Under ideal circumstances, the Property would have been valued between $700,000 and $800,000; however, given its condition following the foreclosure, Forcum agreed to list the Property for $325,000. Pursuant to his obligations, in addition to showing the Property to prospective buyers, Forcum paid the utility bills; he ensured that the lawn was mowed and the Property was otherwise maintained; and he conducted weekly inspections, during which he verified that the house was secure.

[6] On April 16, 2012, Forcum drove past the Property and noticed that a red flag was hanging from the gate at the end of the driveway. The next day, he returned to the Property to conduct his weekly inspection. Upon arrival, he observed a lawn mower and mowing trailer in the driveway and initially

assumed that the regular mowing crew was working on the yard. However, he grew concerned when he noticed that two men were standing on a second-floor balcony because the mowing crew would have no reason to enter the residence. When Forcum exited his vehicle, one of the men on the balcony—Ankh-El— inquired into Forcum's presence. Forcum explained that he is a real estate broker, and, in response, Ankh-El identified himself as the new owner of the Property. Knowing this could not be the case given his exclusive listing rights, Forcum returned to his vehicle and drove away from the Property while calling the Indianapolis Metropolitan Police Department (IMPD).

[7]    Forcum waited at the end of the long driveway until IMPD officers arrived. Forcum apprised the officers of his concern that there was an individual squatting on the Property, and he provided the officers with his credentials and a copy of the listing agreement which identified him as the agent responsible for selling the Property. Thereafter, the officers proceeded down the driveway and observed Ankh-El and another male standing outside. The officers identified themselves and explained the nature of their visit. Ankh-El informed the officers that he had recently purchased the property for $250,000, and he acted perplexed as to why there would be any indication that the Property was still listed for sale. When asked for proof of his ownership, Ankh-El stated that he had such documentation at another location, so he locked the doors to the house and drove away from the Property while the officers and Forcum waited for him to return. During Ankh-El's absence, one of the officers contacted the Marion County Assessor's Office, which reported that the current owner of

record for the Property was Bank of New York Mellon. A short while later, Ankh-El drove up to the Property on a black Yamaha motorcycle. Ankh-El provided the officers with an identification card with his name and photograph, which identified him as a "Moorish National" and listed his birthplace as Marion County, Indiana. (State's Exh. 13). Ankh-El admitted that he had created the identification card himself and explained some of the history of the Moorish people; specifically, he "talked about [how] the laws of [the] land [do not] apply to Moorish Nationals." (Tr. p. 216).

[8] In addition, Ankh-El tendered a document to the officers entitled "FREEHOLD IN DEED." (State's Exh. 1). According to Ankh-El, this deed, which he had also created himself, evidenced his ownership rights in the Property. The homemade deed, stated, in part:

> I, Menes Ankh-El, being in propria persona, sui juris, am a Free Moorish American National of Al Moroc (America) North, Central, South America and Adjoining Islands anciently referred to as Amexem, and I am part and parcel to the Land of my ancient Foremothers, and Fathers (Moabites/Moroccans) by birthright and inheritance as an aboriginal, indigenous and de jure natural citizen of the Continental United States of America Republic. Therefore, by the power and authority vested in me by right of birth and right of soil, retaining all substantive unalienable rights and immunities in the Organic United States of America Republic Constitution, I, Menes Ankh-El, am claiming FREEHOLD IN DEED of the abandoned and unoccupied [Property].

(State's Exh. 1). Immediately preceding his signature, the Freehold in Deed contained a declaration that "I, Menes Ankh-El, am NOT a citizen governed

under Naturalization or Immigration, NOT a 14th Amendment 'Person' or 'U.S. Citizen', NOT subject to statutory, colorable law jurisdiction of the United States in the corporate monopoly of the federal, State, local, and municipal governments(s) [*sic*]." (State's Exh. 1). Ankh-El filed his Freehold in Deed with the Marion County Recorder on March 28, 2012.

[9] Based on Ankh-El's self-created documents, the officers determined that he was unlawfully occupying the Property and placed him under arrest. A subsequent inspection of the Property revealed that Ankh-El, after gaining access to the house, had changed all of the locks and had mounted multiple "No Trespassing" signs. (State's Exh. 6). He had also moved a number of his personal belongings, including a set of bolt cutters, into a third floor bedroom, and his laptop was plugged into an outlet. At the jail, Ankh-El was fingerprinted, and his fingerprints matched the criminal record of Wendell Brown.[2] A review of Wendell Brown's record from the Bureau of Motor Vehicles (BMV) revealed that his driver's license was suspended.

[10] On August 30, 2012, the State filed an amended Information, charging Ankh-El (*i.e.*, Wendell Brown) with Count I, burglary, a Class C felony, I.C. § 35-43-2-1 (2011); Count II, forgery, a Class C felony, I.C. § 35-43-5-2(b) (2011); Count III, theft, a Class D felony, I.C. § 35-43-4-2(a) (2011); Count IV, trespass, a

---

[2] There is no indication in the record as to whether Ankh-El ever legally changed his name from Wendell Brown. Prior to trial, Ankh-El conceded that he was "formerly known as Wendell Brown," but he disagreed with any indication that the name Ankh-El is an *also known as* moniker because his name is "[j]ust Menes Ankh-El." (Tr. pp. 4-5).

Class A misdemeanor, I.C. § 35-43-2-2(a)(4) (2011); and Count V, driving while suspended, a Class A misdemeanor, I.C. § 9-24-19-2 (2012).

[11] After the charges were filed, Ankh-El elected to represent himself and began filing a multitude of motions. Several of his motions sought dismissal based on the claim that the trial court lacked both personal and subject matter jurisdiction. Specifically, Ankh-El asserted that the trial court lacked authority under the United States Constitution to hear the case, and he further insisted that he is neither a citizen of the United States or Indiana, nor a party to a contract with the State of Indiana. Essentially, he insisted that as a "Private Moorish American National Man," he is not subject to the power of the courts or the laws of this state. (Appellant's App. p. 28). Ankh-El also sought dismissal due to lack of evidence, arguing, in part, that he was rightfully entitled to claim the Property under the doctrine of adverse possession. Additionally, Ankh-El claimed that the trial court violated his right to assistance of counsel and the Vienna Convention by refusing to allow his "Consuls" to address the trial court on his behalf. (Appellant's App. p. 27). He also accused the trial court of committing perjury, and he alleged that the trial court had exhibited extreme prejudice by failing to rule on motions and by preventing the State from responding to his motions. In a few motions, Ankh-El alleged that he was entitled to a default judgment because the trial court and the State had failed to respond to his various motions regarding the trial court's lack of jurisdiction, as well as other accusations by Ankh-El against the State and trial court, including treason, fraud and "[b]arratry." (Appellant's App. p. 30). Furthermore, Ankh-

El challenged the validity of the charging Information, positing that the Information does not clearly identify the owner of the Property and that it includes other vague references. Ankh-El additionally argued that the Information failed to properly identify him because he has "a Nationality which is Moorish American [and] for the [I]nformation to designate [him] as a black male and as WENDELL BROWN© [*sic*] is denationalization and violation of the 13th Amendment prohibitions of slavery and involuntary servitude." (Appellant's App. p. 42). While the trial court denied several of these motions, the record is unclear as to whether it actually issued rulings as to the rest.

[12] On July 24, 2013, the trial court conducted a jury trial. At the close of the evidence, the jury returned a guilty verdict on all Counts. On August 2, 2013, the trial court held a sentencing hearing. The trial court merged Count III, theft as a Class D felony, and Count IV, trespass as a Class A misdemeanor, into Count I and entered a judgment of conviction on Count I, burglary as a Class C felony; Count II, forgery as a Class C felony; and Count V, driving while suspended as a Class A misdemeanor. For Count I and Count II, the trial court imposed concurrent sentences of four years, with two years executed through Community Corrections and two years suspended with one year of probation for each Count. As to Count V, the trial court ordered Ankh-El to serve a one-year term in Community Corrections, concurrent with his sentence for Counts I and II.

[13] On November 1, 2013, Ankh-El filed his Notice of Appeal. On May 12, 2014, this court dismissed Ankh-El's appeal with prejudice because it was not timely

filed. On June 2, 2014, Ankh-El filed a petition for rehearing, which we denied on June 23, 2014. On August 26, 2014, Ankh-El filed a Demand for Acceptance of Belated Petition to Transfer, which the Indiana Supreme Court granted on September 12, 2014. On May 26, 2015, the supreme court granted Ankh-El's petition to transfer. In its order, the supreme court noted that Ankh-El had filed a response with our court to show cause why his appeal should not have been dismissed due to an untimely Notice of Appeal, but the response was incorrectly filed under a different appeal initiated by Ankh-El and, therefore, was likely not reviewed. Moreover, Ankh-El submitted an order from the trial court that extended the time for filing his Notice of Appeal to November 2, 2013, likely in accordance with Indiana Trial Rule 72(E); thus, his November 1, 2013 Notice of Appeal was actually timely. Accordingly, the supreme court vacated our dismissal of Ankh-El's appeal and our denial of his petition for rehearing and remanded the case to our court for further proceedings. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Jurisdiction*

Ankh-El first claims that his conviction must be vacated because the trial court lacked subject matter jurisdiction.[3] "Subject-matter jurisdiction is 'the power to

---

[3] We note that Ankh-El has waived any contention that the trial court lacked personal jurisdiction because, although raised in his pre-trial motions, he has failed to raise the issue on appeal. *See* Ind. Appellate Rule 46(A)(8)(a). Regardless, it is clear that the trial court did have personal jurisdiction over Ankh-El because his crimes occurred in Marion County, Indiana. *See Taylor-Bey v. State*, 53 N.E.3d 1230, 1232 (Ind. Ct. App. 2016).

hear and determine cases of the general class to which any particular proceeding belongs.'" *Taylor-Bey*, 53 N.E.3d at 1231 (quoting *K.S. v. State*, 849 N.E.2d 538, 540 (Ind. 2006)). "An Indiana court obtains subject-matter jurisdiction through the Indiana Constitution or a statute." *Id.* Pursuant to Indiana statute, all standard and non-standard superior courts have "original and concurrent jurisdiction in all civil cases and in all criminal cases." I.C. §§ 33-29-1-1.5(1); -1.5-2(1). In this case, Ankh-El's crimes were alleged to have occurred in Marion County, Indiana, and the State filed charges in the Marion Superior Court.

[15] According to Ankh-El, the United States Constitution confers authority to hear a case in which a state is named as a party solely to the United States Supreme Court. Because the present case was "brought in the name of STATE OF INDIANA (*i.e.* STATE OF INDIANA v. WENDELL BROWN)," Ankh-El insists that the Indiana Code's bestowal of "original and concurrent jurisdiction" upon Marion County courts is "repugnant to the U.S. Constitution (1787/1791)." (Appellant's Br. p. 12) (Italics added). Additionally, Ankh-El contends that "[a]s an Aboriginal Moorish American National and descendant of Africans (Moroccans) born in America, [he is] not and cannot be a state or U.S. citizen" and is therefore not subject to the authority of Indiana courts. (Appellant's Br. p. 12). In fact, Ankh-El argues that he is "a member of the 'sovereignty'" and is "not bound by general words in statutes." (Appellant's Br. p. 15). Instead, "[a]s a sentient being," he claims that he is "governed by common law and [has] the natural right to do anything which [his] inclinations

may suggest, if it be not evil in itself, and in no way impairs the rights of others." (Appellant's Br. p. 14). We find no merit in Ankh-El's rambling contentions.

[16] The State aptly points out that "[i]t is well established that states are separate sovereigns with respect to the federal government 'because each State's power to prosecute is derived from its own 'inherent sovereignty,' not from the Federal Government.'" *Jackson v. State*, 563 N.E.2d 1310, 1311 (Ind. Ct. App. 1990). Thus, the power vested in Indiana's superior courts by Indiana statute does not run afoul of the United States Constitution. As support for his assertion that he is impervious to the jurisdiction of Indiana's courts based on his lack of citizenship, Ankh-El relies primarily on *Dred Scott v. Sandford*, 60 U.S. 393, 406, 427 (1856), *superseded by constitutional amendment,* U.S. CONST. amend XIV, wherein the United States Supreme Court determined that the plaintiff, a descendant of African slaves, could not be considered a United States citizen such that the court lacked the jurisdiction to resolve his civil case. However, we find Ankh-El's reliance on the *Dred Scott* case entirely misplaced and unpersuasive in light of the fact that the Fourteenth Amendment overturned *Dred Scott* in 1868.

[17] The Fourteenth Amendment to the United States Constitution provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. CONST. art. XIV § 1. Here, there is no dispute that Ankh-El was born in Marion County, Indiana, and he was residing there at the time he

committed the present offenses, which were also committed in Marion County. Moreover, Ankh-El's citizenship is irrelevant to the determination of whether a trial court has authority, by constitution or statute, to hear a certain type of case. *See Taylor-Bey*, 53 N.E.3d at 1232. Rather, by the explicit authority of Indiana statute, the Marion Superior Court was vested with subject matter jurisdiction over Ankh-El's criminal case. *See* I.C. §§ 33-29-1-1.5(1); -1.5-2(1).

## II. *Right to Counsel*

[18] Ankh-El next claims that he was denied the right to counsel in violation of the Sixth Amendment to the United States Constitution. "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend VI. The right to counsel "is essential to the fairness of a criminal proceeding." *Drake v. State*, 895 N.E.2d 389, 392 (Ind. Ct. App. 2008). In this case, Ankh-El asserts that the trial court denied his request to be represented by his "Consuls from the Moorish American Nation" due to the fact that "they did not have a license to practice law[] and that they were not members of the B.A.R. [*sic*]." (Appellant's Br. p. 16).

[19] We note that the record is devoid of any proceedings regarding Ankh-El's request to be represented by Moorish Consuls and the trial court's denial thereof. At some point, Ankh-El elected to proceed *pro se*, and the trial court appointed standby counsel to assist him with procedural matters during the trial. As the State points out, Ankh-El has waived his argument for appeal by

failing to cite to the record. *See* App. R. 46(A)(8)(a). Nevertheless, we elect to address Ankh-El's claim.[4]

[20] Our courts have held that "[t]he Sixth Amendment right to counsel encompasses a right to counsel of one's choice." *Latta v. State*, 743 N.E.2d 1121, 1127 (Ind. 2001) (citing *Powell v. Alabama*, 287 U.S. 45, 53 (1932)). "The right to counsel of choice has been described as an 'essential component' of the Sixth Amendment right to counsel, and 'a defendant should be afforded a fair opportunity to secure counsel of his own choice.'" *Barham v. State*, 641 N.E.2d 79, 82 (Ind. Ct. App. 1994) (citation omitted) (quoting *Powell*, 287 U.S. at 53). "A conviction attained when a court unreasonably or arbitrarily interferes with an accused['s] right to retain counsel of choice . . . cannot stand, irrespective of whether the defendant has been prejudiced." *Id.* (alterations in original) (internal quotation marks omitted).

[21] Here, Ankh-El asserts that the trial court denied his request to retain "Consuls from the Moorish American Nation" because they did not have licenses to practice law in Indiana. (Appellant's Br. p. 16). Ankh-El now argues that this denial of his choice of counsel amounted to a violation of due process. In particular, he asserts that "[t]he practice of law cannot be licensed by any

---

[4] During the pendency of this appeal, Ankh-El filed several motions requesting that our court order the trial court to provide him with transcripts of the pre-trial proceedings. We directed the trial court to send Ankh-El a free copy of the clerk's record and transcript, and on January 8, 2016, the trial court filed its Notice of Compliance. Thereafter, Ankh-El filed additional motions indicating that he had not yet received pre-trial transcripts, which our court denied based on the trial court's Notice of Compliance.

state/STATE." (Appellant's Br. p. 16). Instead, without proper citation to authority, Ankh-El insists that a licensed attorney may be certified by the supreme court solely to "represent wards of the court, infants and persons of unsound mind, whom they owe no allegiance should a conflict arise between their client and the interest of the courts. Nowhere can there be found a competent attorney that is able to execute the proper remedy without embarrassing the court." (Appellant's Br. pp. 16-17) (citation omitted).

[22] In addition, relying on *Gideon v. Wainright*, 372 U.S. 335 (1963), Ankh-El argues that "[l]itigants may be assisted by unlicensed laymen during judicial proceedings." (Appellant's Br. p. 16). We, however, find nothing in *Gideon* to support such an assertion. Rather, the *Gideon* Court established that the Sixth Amendment right to counsel is a fundamental right that is essential to a fair trial, and, as such, it is applicable to the states through the Fourteenth Amendment. *Gideon*, 372 U.S. at 342-43. Moreover, contrary to Ankh-El's claim, the State of Indiana absolutely governs the practice of law. In fact, the Indiana Supreme Court "has exclusive jurisdiction to . . . admit attorneys to practice law in all courts of the state." I.C. § 33-24-1-2(b)(1); *see* IND. CONST. art. 7, § 4 (granting the supreme court original jurisdiction over, in part, the admission to the practice of law and the unauthorized practice of law). Accordingly, the supreme court has promulgated an extensive list of rules governing the admission and discipline of attorneys, such as the requirement that "[n]o person shall be licensed to practice law in this state who has not

taken and passed a Bar examination." Ind. Admission & Discipline Rule 17, §
1.

[23]     The Indiana Supreme Court's "authority to set standards for and supervise the
practice of law emanates from the need to protect the public from those who are
not properly licensed or otherwise qualified to act as attorneys." *State ex rel. Ind.
State Bar Ass'n v. Northouse*, 848 N.E.2d 668, 671 (Ind. 2006). As our supreme
court has stated, "[t]he practice of law without a license is not a 'victimless
crime' because the legal interests of people assisted by those who are not
qualified to act as attorneys can be irreparably damaged." *State ex rel. Ind. State
Bar Ass'n v. Diaz*, 838 N.E.2d 433, 443 (Ind. 2005). As such,

> [a] person who:
> (1) professes to be a practicing attorney;
> (2) conducts the trial of a case in a court in Indiana; or
> (3) engages in the business of a practicing lawyer;
> without first having been admitted as an attorney by the supreme
> court commits a Class B misdemeanor.

I.C. § 33-43-2-1. Accordingly, while Ankh-El had every right to privately retain
a licensed lawyer of his choosing, he had no right to demand the assistance of
representatives who are not legally permitted to practice law in Indiana. Thus,
the trial court did not violate Ankh-El's Sixth Amendment right to counsel.

### III. *Sufficiency of Evidence*

[24]     Ankh-El next challenges the probable cause supporting the charges against him.
However, we agree with the State that this issue is more appropriately framed
as whether the State presented sufficient evidence to support Ankh-El's

conviction for burglary, forgery, and driving while suspended beyond a reasonable doubt. When reviewing a claim of insufficient evidence, our court will only consider the evidence that is most favorable to the verdict, along with any reasonable inferences derived from that evidence. *Freshwater v. State*, 853 N.E.2d 941, 942 (Ind. 2006). We do not reweigh evidence or assess the credibility of witnesses. *Baker v. State*, 968 N.E.2d 227, 229 (Ind. 2012). "If a reasonable finder of fact could determine from the evidence that the defendant was guilty beyond a reasonable doubt, then we will uphold the verdict." *Id.* (quoting *Freshwater*, 853 N.E.2d at 942).[5]

## A. *Burglary*

[25] "A person who breaks and enters the building or structure of another person, with intent to commit a felony in it, commits burglary, a Class C felony." I.C. § 35-43-2-1 (2011). In this case, there is no dispute that Ankh-El broke into and entered the Property. Although Ankh-El posits that the Property was owned by Bank of New York Mellon, rather than Bank of America, he clearly concedes that the Property was owned by "another person" as required by Indiana Code section 35-43-2-1. *See* I.C. § 35-31.5-2-234 (defining "person" to include

---

[5] Ankh-El devotes a significant portion of his argument focusing on whether Forcum had any contractual right to sell the Property, as well as on the actual ownership of the Property given the complex relationship between Bank of America and Bank of New York Mellon. We find that these issues are entirely irrelevant to whether Ankh-El committed the charged offenses. Similarly, Ankh-El's assertion that Forcum lacked standing to file a complaint evidences a fundamental misunderstanding of the difference between civil law and criminal law. Here, the *State*—not Forcum—filed charges against Ankh-El, alleging that he violated Indiana's *criminal* law. This is not a situation where Forcum filed a civil lawsuit against Ankh-El.

corporations). On appeal, Ankh-El contends that there is no evidence that he possessed the intent to commit a felony therein.

[26] "To establish the intent to commit a felony element of a burglary charge, the State must prove beyond a reasonable doubt the defendant's intent to commit a felony specified in the charge." *Freshwater*, 853 N.E.2d at 942. The "[i]ntent to commit a given felony may be inferred from the circumstances, but some fact in evidence must point to an intent to commit a specific felony." *Id.* (alteration in original) (quoting *Justice v. State*, 530 N.E.2d 295, 297 (Ind. 1988)). Here, the Information alleged that Ankh-El broke into and entered the Property "with intent to commit the felony of theft therein; that is, with intent to knowingly exert unauthorized control over the property of [Forcum] and/or Bank of New America and/or Bank of New York, with intent to deprive [Forcum] and/or Bank of America and/or Bank of New York of any part of its value or use." (Appellant's App. p. 5).

[27] Ankh-El asserts that there is no evidence that he intended to commit a felony because the evidence establishes that he "was actually living on the [P]roperty" and "that nothing was out of place." (Appellant's Br. pp. 21-22). He indicates that this case is analogous to *Easton v. State*, 228 N.E.2d 6, 9, 13 (Ind. 1967), in which our supreme court found insufficient evidence of felonious intent to sustain a burglary conviction where the defendant entered a woman's apartment by breaking the lock and, upon the owner's return, was discovered sitting on the couch watching television; the defendant offered to pay for the lock as he left and nothing was stolen. We, however, find that there is ample

evidence of Ankh-El's intent to commit a felony. Unlike the defendant in *Easton*, who left the premises without disturbing anything inside the apartment, Ankh-El had no intention of vacating the Property. Rather, the evidence establishes that Ankh-El broke into the house with the intent to use the house as his personal residence, thereby depriving the Property's rightful owner(s) of its value or use. *See* I.C. § 35-43-4-2(a) ("A person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft," which is a Class C felony if the fair market value of the property is at least $100,000.). In particular, Ankh-El informed Forcum and the IMPD officers that he was the owner of the Property, which he had recently purchased for $250,000. Ankh-El created a deed purporting to claim the Property as his own, and he filed this homemade document with the Marion County Recorder. He also hung a flag on the front gate, changed all of the locks, and posted multiple signs warning against trespassing. In addition, Ankh-El moved a number of his personal belongings into the residence and garage, including clothing, a lawnmower, and a laptop. Thus, it is apparent that Ankh-El intended to steal the Property from its owner(s).

[28] Nevertheless, Ankh-El insists that his burglary conviction cannot stand because he was legally entitled to claim the Property under the doctrine of adverse possession. "'[T]he doctrine of adverse possession entitles a person without title to obtain ownership to a parcel of land upon clear and convincing proof of control, intent, notice, and duration.'" *Altevogt v. Brand*, 963 N.E.2d 1146, 1151

(Ind. Ct. App. 2012) (quoting *Fraley v. Minger*, 829 N.E.2d 476, 485 (Ind. 2005)). In particular, the claimant: "must exercise a degree of use and control over the parcel that is normal and customary considering the characteristics of the land"; "must demonstrate intent to claim full ownership of the tract superior to the rights of all others, particularly the legal owner"; must undertake actions "sufficient to give actual or constructive notice to the legal owner of the claimant's intent and exclusive control"; and "must satisfy each of these elements continuously" for a period of ten years. *Id.* at 1152 (citing *Fraley*, 829 N.E.2d at). Furthermore, a claimant may not establish title by adverse possession unless he or she "pays and discharges all taxes and special assessments that the adverse possessor or claimant reasonably believes in good faith to be due on the land or real estate during the period the adverse possessor or claimant claims to have possessed the land or real estate adversely." I.C. § 32-21-7-1.

[29] Ankh-El contends that he began occupying the Property on February 15, 2012. He also posits that his "possession of the [P]roperty was open and notorious, as [his] flag was flown from the gate which [he] had locked; [he] had changed all of the l[o]cks to all doors and [he] was maintaining the [P]roperty openly (repairs, landscaping)." (Appellant's Br. p. 19). Accordingly, Ankh-El now argues that his rights were superior to those of Forcum or the banks because his "physical control of the [P]roperty was sufficient to form basis for title." (Appellant's Br. p. 20). We find no merit in Ankh-El's claim.

Failure to establish even one of the adverse possession elements by clear and convincing evidence defeats the claim. *Altevogt*, 963 N.E.2d at 1152. Ankh-El asserts that he took possession of the Property on February 15, 2012; however, Forcum testified that he had been conducting weekly inspections of the Property, and prior to the week of April 17, 2012, the house was empty and secure. Regardless, even accepting Ankh-El's date of February 15, 2012, his adverse occupancy of the Property barely exceeded two months before he was arrested and charged with burglary and trespass. As he failed to satisfy the elements of adverse possession for a continuous ten-year period, Ankh-El has no claim to the title of the Property. Therefore, we conclude that the State presented sufficient evidence to support Ankh-El's conviction for burglary as a Class C felony.

## B. *Forgery*

"A person who, with intent to defraud, makes, utters, or possesses a written instrument in such a manner that it purports to have been made . . . with different provisions[] or . . . by authority of one who did not give authority[] commits forgery, a Class C felony." I.C. § 35-43-5-2(b)(3)-(4) (2011). "An intent to defraud involves an intent to deceive and thereby work a reliance and an injury." *Diallo v. State*, 928 N.E.2d 250, 252 (Ind. Ct. App. 2010). Thus, "[t]here must be a potential benefit to the maker or potential injury to the defrauded party." *Id.* at 253. As "intent is a mental state, the fact-finder often must 'resort to the reasonable inferences based upon an examination of the surrounding circumstances to determine' whether—from the person's conduct

and the natural consequences therefrom—there is a showing or inference of the requisite criminal intent." *Id.*

[32] In this case, the State alleged that Ankh-El, with an intent to defraud, made a Freehold in Deed and uttered the same to the IMPD officers "in such a manner that it purported to have been made with different provisions and/or purported to have been made by the authority of [Forcum] and/or Bank of America and/or Bank of New York, who did not give such authority." (Appellant's App. p. 6). On appeal, Ankh-El contends that he filed the Freehold in Deed to notify the owner that he was "taking possession of the property by right" but that it "does not purport to be a grant of property." (Appellant's Br. p. 20). He asserts that his document cannot constitute a forgery because it does not "list the record owner or someone else as a grantor of the [P]roperty." (Appellant's Br. p. 20). Again, we are unpersuaded by Ankh-El's argument.

[33] Ankh-El created and provided the IMPD officers with a fictitious deed, which purported to give him ownership rights to the Property. In conjunction with tendering his Freehold in Deed to the officers, Ankh-El claimed that he had recently purchased the Property for $250,000; thus, he relied on the deed as proof of his lawful ownership in order to deceive the officers. *See Malcomson v. State*, 391 N.E.2d 633, 637 (Ind. Ct. App. 1979). We find that this satisfies the forgery statute and therefore affirm his conviction.

A person who:
(1) knows that the person's driving privilege, license, or permit is suspended or revoked; and
(2) operates a motor vehicle upon a highway less than ten (10) years after the date on which judgment was entered against the person for a prior unrelated [violation for driving while suspended];
commits a Class A misdemeanor.

I.C. § 9-24-19-2 (2012).

[35] In challenging the sufficiency of the evidence to support his conviction for driving while suspended, Ankh-El does not contest that his driver's license was suspended at the time the IMPD officers observed him driving his Yamaha motorcycle; nor does he argue that the State failed to establish that he had a prior violation for driving while suspended within the preceding ten years. Instead, Ankh-El simply insists that because he "was not operating a vehicle in a commercial capacity, [he is] not required to have a driver's license." (Appellant's Br. p. 22). He also claims that the State has no authority to deny him the right to travel. Ankh-El further asserts, without citing to any authority, that in order to support a conviction for driving while suspended, the officers were required to make a valid traffic stop. We disagree.

[36] The driving while suspended statute does not require that an officer discover that a driver's license is suspended in the course of a valid traffic stop. It is sufficient that the IMPD officers observed Ankh-El operating his motorcycle,

and BMV records later confirmed that Ankh-El's driver's license was suspended at the time and had been suspended within the last ten years. Moreover, while this court has previously acknowledged that "a fundamental right to travel" exists, "neither this court, nor our supreme court, nor the United States Supreme Court has ever held that there exists a fundamental right to drive a motor vehicle." *Terpstra v. State*, 529 N.E.2d 839, 847 (Ind. Ct. App. 1988). Rather, our General Assembly "has a duty to enact legislation providing for the general welfare and safety of the people of this state." *Id.* at 846. The statutes governing driving privileges "promote highway safety[,]" which "is a compelling state interest." *Id.* "The statute concerning driver's licenses ensures a driver's ability to maneuver a motor vehicle on public roads in Indiana, thus promoting public safety." *Id.* Accordingly, the General Assembly had the authority to enact laws requiring valid driver's licenses as a condition to operating a motor vehicle on public roads, and if Ankh-El sought to avail himself of the privilege of operating a vehicle in this state, he was obligated to comply with Indiana law. *Id.* at 847. There is sufficient evidence to support Ankh-El's conviction for driving while suspended as a Class A misdemeanor.

IV. *Charging Information*

[37] Ankh-El next claims that his conviction must be reversed because the charging Information was fatally defective. Indiana law provides that "all prosecutions of crimes shall be instituted by the filing of an information or indictment by the prosecuting attorney, in a court with jurisdiction over the crime charged." I.C. § 35-34-1-1(b). Indiana Code section 35-34-1-2 enumerates the criteria for the

content of an information. "The proper method to challenge deficiencies in a charging information is to file a motion to dismiss the information, no later than twenty days before the omnibus date." *Miller v. State*, 634 N.E.2d 57, 60 (Ind. Ct. App. 1994) (citing I.C. § 35-34-1-4(b)(1)). In this case, on June 21, 2013, Ankh-El filed a "Demand for Dismissal" in which he alleged that the Information was defective due to lack of subject matter jurisdiction, failure to state charged offenses with sufficient certainty, and failure to identify the defendant with certainty. (Appellant's App. p. 41).[6]

[38] On appeal, Ankh-El contends that the Information "failed to give an allegation of jurisdiction," which "makes the complaint [*sic*] facially void." (Appellant's Br. p. 23). Pursuant to Indiana Code section 35-34-1-2(a)(7), a charging information is required to state "the place of the offense with sufficient particularity to show that the offense was committed within the jurisdiction of the court where the charge is to be filed." In this case, the Information specifically stated that Ankh-El committed the crimes alleged therein "in Marion County, Indiana." (Appellant's App. p. 5). Therefore, we find no defect in the Information on this basis.

[39] Ankh-El also contends that the Information failed to adequately name him as the defendant. Indiana Code section 35-34-1-2(a)(9) stipulates that an

---

[6] As the Chronological Case Summary (CCS) does not specify the omnibus date, we are unable to discern whether Ankh-El's dismissal motion was timely filed (although challenges to subject matter jurisdiction may be made at any time pursuant to Indiana Code section 35-34-1-4(b)). Additionally, Ankh-El's motion to dismiss is not reflected in the CCS, and it is unclear whether the trial court ever formally ruled on the motion.

information must state "the name of every defendant, if known, and if not known, by designating the defendant by any name or description by which he can be identified with reasonable certainty." Here, the Information identified "WENDELL BROWN" as the defendant. (Appellant's App. pp. 5-7). However, according to Ankh-El:

> I provided lawful identification, My Moorish American Nationality Card, to an officer of STATE OF INDIANA [(*i.e.,* a notary public),] who acknowledged that I Am Menes Ankh El and I signed the "FREEHOLD IN DEED" in front of her. The "FREEHOLD IN DEED", so acknowledged, is entitled to be received in evidence in the courts of STATE OF INDIANA without further authentication that I Am Menes Ankh El. STATE OF INDIANA'S and the court's attempt to make Me be the BLACK MALE, WENDELL BROWN is contrary to the evidence provided by STATE OF INDIANA. Therefore, I am not WENDELL BROWN and cannot be reasonably identified as such and the STATE OF INDIANA failed to prove such, and thus leaving the court wanting for personal jurisdiction.

(Appellant's Br. p. 24) (citation omitted).

[40] Ankh-El argued in a pre-trial motion for dismissal that the Information's reference to him as Wendell Brown, rather than Ankh-El, constitutes "denationalization and violation of the 13th Amendment prohibitions of slavery and involuntary servitude[,]" but he never contended that he and Wendell Brown are not the same person. (Appellant's App. p. 42). As such, we find that Ankh-El is raising this argument for the first time on appeal and has therefore waived the issue. *See King v. State*, 799 N.E.2d 42, 47 (Ind. Ct. App. 2003) ("[A] defendant is limited to the grounds advanced at trial and may not

raise a new ground for objection for the first time on appeal."), *trans. denied*; *cert. denied*, 543 U.S. 817 (2004). Waiver notwithstanding, Ankh-El's argument fails. The Information need only identify "the defendant by any name or description by which he can be identified with reasonable certainty." I.C. § 35- 34-1-2(a)(9). Following Ankh-El's arrest, his fingerprints established his identity as Wendell Brown. Moreover, Ankh-El acknowledged to the trial court that he was formerly known as Wendell Brown, and there is no indication that Ankh-El ever legally changed his name from Wendell Brown. Accordingly, we find that the Information adequately identified him as the defendant.

[41] Ankh-El next challenges the adequacy of the description of his offenses in the Information. An information is required to set "forth the nature and elements of the offense charged in plain and concise language without unnecessary repetition." I.C. § 35-34-1-2(a)(4). Similarly, Indiana Code section 35-34-1-2(d) further provides that the information "shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Ankh-El argues that the State's repeated use of the phrase "and/or" in the burglary and forgery charges "substantially prejudiced [his] rights to due process, as proper defense preparation was hindered." (Appellant's Br. p. 25). In particular, Ankh-El challenges the language in the burglary Count that he broke and entered a building belonging to "Forcum and/or Bank of America and/or Bank of New York." (Appellant's App. p. 5). Likewise, for the forgery Count, Ankh-El points to language that he "ma[d]e and/or utter[ed] to Officer Brian

McCann and/or Officer Matthew Addington and/or Detective Brian Hoffmeister a written instrument . . . in such a manner that it purported to have been made . . . by the authority of [Forcum] and/or Bank of America and/or Bank of New York." (Appellant's App. pp. 5-6). According to Ankh-El, "[t]he phrase 'and/or' is being used as a catch all which is improper and leaves the charges wanting for clarity." (Appellant's Br. p. 25). We disagree.

[42] The purpose of an information is to advise a defendant of the crime with which he is charged so that he may prepare a defense. *Miller*, 634 N.E.2d at 61. Here, the Information adequately apprised Ankh-El that he was being charged with breaking and entering the Property and with forging a deed that purported to grant him ownership rights in the Property. There were complex contractual issues regarding the ownership of the Property between the banks, and Forcum acted as a representative of the banks, but the ultimate ownership of the Property among these three entities has no bearing on Ankh-El's ability to defend against the claims that he committed burglary and forgery. Likewise, it is entirely irrelevant to which of the three IMPD officers Ankh-El tendered his Freehold in Deed as the Information makes it abundantly clear that Ankh-El purportedly used the Freehold in Deed in an attempt to convince the officers that he owned the Property. Thus, the Information is not defective for failure to set forth the charged offenses in plain and concise language.

## V. *Fundamental Error*

[43] Finally, Ankh-El claims that the trial court exhibited prejudice which resulted in fundamental error. "The fundamental error doctrine permits a reviewing

court to consider the merits of an improperly raised error if the reviewing court finds that the error was so prejudicial to the rights of the appellant that he could not have had a fair trial." *Madden v. State*, 656 N.E.2d 524, 526 (Ind. Ct. App. 1995), *trans. denied*. "A fundamental error is a substantial, blatant violation of basic principles of due process rendering the trial unfair to the defendant." *State v. Eubanks*, 729 N.E.2d 201, 206 (Ind. Ct. App. 2000), *trans. denied*. The fundamental error doctrine is a narrow exception to the general rule that an objection must be raised to preserve an error for appeal; thus, it is applied only where "the harm or potential for harm [can]not be denied." *Id.* (alteration in original) (quoting *Canaan v. State*, 683 N.E.2d 227, 235-36 n.6 (Ind. 1997)).

[44] Our review of the record reveals that prior to trial, Ankh-El filed a plethora of motions, most of which failed to present sound, comprehensible legal arguments. According to Ankh-El, the trial court committed fundamental error by failing "to give any of [his] motions or affidavits proper consideration and there were no hearings held on any of the motions and affidavits which pertained to the jurisdiction or the subject-matter of the action." (Appellant's Br. p. 26). We first note that the CCS does not include any information about matters that occurred prior to trial, so we are unable to discern how Ankh-El's motions were actually handled. Indiana Trial Rule 53.1(A) provides:

> In the event a court fails for thirty (30) days to set a motion for hearing or fails to rule on a motion within thirty (30) days after it was heard or thirty (30) days after it was filed, if no hearing is required, upon application by an interested party, the submission of the cause may be withdrawn from the trial judge and

transferred to the [Indiana] Supreme Court for the appointment
of a special judge.

There is no indication here that Ankh-El availed himself of this procedure upon the trial court's failure to rule on his various motions. Moreover, on appeal, Ankh-El has failed to set forth a cogent argument regarding how the trial court's denial, or deemed denial, of his motions deprived him of a fair trial. *See* Ind. App. R. 46(A)(8)(a). Accordingly, Ankh-El has failed to satisfy his burden to demonstrate that the trial court committed fundamental error on this basis.

[45] Ankh-El also contends that the trial court committed fundamental error by "refus[ing] to allow [him] to present [his] defense, which was based on the doctrine of [a]dverse [p]ossession." (Appellant's Br. p. 26). We find that this contention lacks any support in the record. During Ankh-El's cross-examination of Forcum at trial, Ankh-El asked Forcum whether he had "ever heard of adverse possession" or was "aware of Indiana statutes on adverse possession." (Tr. pp. 186-87). The State objected on grounds of relevance, and the court sustained the State's objection. Thereafter, during his case-in-chief, Ankh-El presented no evidence in support of a defense theory of adverse possession, and he did not request that the jury be instructed on adverse possession. Thus, he cannot argue now that the trial court prevented him from presenting such a defense. Furthermore, even if the trial court had denied Ankh-El the opportunity to present an adverse possession defense, it would not have had any impact on the outcome of the case. As already discussed at length, Ankh-El's adverse possession claim is entirely meritless in light of the

fact that he did not meet the requisite duration for adverse possession. Thus, there is no error, let alone fundamental error.

## CONCLUSION

[46] Based on the foregoing, we conclude that the trial court had subject matter jurisdiction over this case; the trial court did not violate Ankh-El's Sixth Amendment right to counsel; the State presented sufficient evidence to support Ankh-El's conviction for burglary, forgery, and driving while suspended beyond a reasonable doubt; the charging Information was not defective; and the trial court did not commit fundamental error.

[47] Affirmed.

[48] Bailey, J. and Barnes, J. concur