**FOR PUBLICATION**



ATTORNEY FOR APPELLANT:

**MARK A. BATES**
Office of the Lake County Public Defender
Appellate Division
Crown Point, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JOSEPH Y. HO**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TERRENCE T. WALKER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 45A04-1208-CR-441 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable J. Philip McGraw, Senior Judge
Cause No. 45G04-1010-FA-45

**May 14, 2013**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

## Case Summary

Terrence T. Walker appeals his conviction for class C felony child molesting involving fondling or touching. He argues that the victim's father made several inadmissible statements concerning Walker's guilt, resulting in fundamental error. He also argues that the trial court erred in failing to instruct the jury on class D felony sexual battery because it is a lesser-included offense. Finally, he argues that the trial court abused its discretion in replacing a juror because that juror was the only African-American juror.

We conclude that fundamental error did not occur as a result of any inadmissible testimony. We also conclude that the trial court did not err in failing to instruct the jury on class D felony sexual battery because it is not an inherently or factually included offense of class C felony child molesting as charged here. We further conclude that the trial court did not abuse its discretion in replacing the juror. Therefore, we affirm.

## Facts and Procedural History

In July 2010, thirty-eight-year-old Walker lived in Crown Point with his wife, Crystal King, and two step-daughters, A.K. and M.K. Walker's stepdaughters sometimes played with thirteen-year-old A.B., who lived nearby with her mother ("Mother"), her step-father ("Father"), and her brother.

On the evening of July 14, 2010, A.B. was riding her bike and playing with Walker's stepdaughters. As twilight fell, A.B.'s parents went to Walker's residence to bring A.B. home. Walker was going to set off fireworks, and the girls wanted to watch. Walker told

A.B.'s parents that he and his stepdaughters would walk A.B. home.  A.B.'s parents gave her permission to stay and watch the fireworks, and they returned to their home.

At 11:30 p.m., A.B. was still outside playing with Walker's stepdaughters.  Walker was sitting outside and drinking beer with Keith Woods, who lived across the street.  Walker was intoxicated.  Eventually, Walker told A.B. to go home but to "come back around."  Tr. at 336.  Walker told his stepdaughters to walk A.B. home.  A.B. rode her bike, and the girls walked behind her.  Walker watched from the front of his house.  When A.B. was about halfway home, Walker called his stepdaughters to return home.  They came home and went to bed.  A.B. waited until Walker was alone outside, and she rode her bike back to Walker's residence.  A.B. set her bicycle down in the front yard.  Walker told her to put the bike in the back yard behind the shed.  Walker took A.B. inside his house, and they sat on the couch and watched TV.  Walker touched A.B. on the shoulder and said that she was pretty.  Walker asked A.B. to come with him.  A.B. followed Walker into the kitchen, through the laundry room, and then into the garage.

Walker's car was in the garage.  Walker opened the driver's side door, lifted up the driver's seat, and pushed A.B. into the back seat.  A.B. asked Walker what he was doing.  She told him to stop.  A.B. tried to scream, but Walker covered her mouth with his hand.  Walker pulled down A.B.'s leggings.  He pulled the left leg of her leggings completely off.

He got on top of her. He kissed her neck and told her that she was pretty.[1] A.B. heard someone trying to lift the garage door. Walker got up, told A.B. to stay there, and left. Three or four minutes later, A.B. pulled up her leggings, noticed that her underwear was missing, and went into the house through the laundry room door.

Meanwhile, Mother and Father had fallen asleep at home. They woke up and realized that A.B. was not home. They went to Walker's house. Father knocked on the doors and windows, but nobody answered. Father went across the Street to Woods's house for help. Woods knocked on the door to Walker's house. Woods used his cell phone to call Walker. Walker's wife, King, was in bed alone. She answered the phone. King said that Walker was not at home and that A.B. was not there. Father called the police.

The police arrived in approximately five minutes. Two officers knocked on Walker's front door. A third officer went to the back of the house, observed an empty deck, and returned to the front of the house. King answered the front door in her nightgown. She told the officers that A.B. was not there and that her husband was not home. Walker emerged from the kitchen area and came to the door clothed and wearing tennis shoes. Police asked him to come forward, and Walker stepped outside. He told police that he had been outside on the back deck and that he did not know where A.B. was. Police saw A.B. emerge from the kitchen. A.B. then exited the house through the front door. Mother described A.B. as

---

[1] The State reports that Walker "began assaulting her sexually." Appellee's Br. at 4. Walker argues that the "statement is not true" because the "jury rejected [A.B.'s] story by acquitting Walker on the Class A felony [child molesting involving sexual intercourse] charge." Appellant's Reply Br. at 2. A.B. testified that Walker was on top of her, kissed her, and pulled down her leggings. As such, the State was not mischaracterizing the evidence.

4

"disheveled" and "a complete wreck." *Id.* at 151. A.B. felt "scared," "confused," "like everything was [her] fault that if [she] said something [she] would be in trouble." *Id.* at 348.

The police took A.B. to the side of the house to talk to her. The officers located A.B.'s bike behind Walker's shed. A.B. did not reveal to the police that anything inappropriate had occurred between her and Walker. The officers told A.B.'s parents to take her to the hospital. The police took Walker to the police station for questioning.

A.B.'s parents took her to the hospital. A.B. denied that she had been raped and would not agree to submit to a sexual assault evidence collection kit or "rape kit" because she was "scared" and "uncomfortable" "because all [her] family was in the room" and she "didn't know if they would leave or not." *Id.* at 350. The doctor on staff did not order a rape kit for A.B. because she did not "verbally tell him that she had been raped." *Id.* at 155.

A.B. and her parents returned home. Mother stayed in the car with A.B., who started crying. A.B. went into the house. Mother followed A.B. to the bathroom and noticed that she was not wearing her underwear. Mother had watched A.B. dress that morning and knew that she was wearing underwear when she went out that day. Mother asked A.B. what had happened to her underwear. A.B. began crying again and told Mother that Walker had taken her into his car and sexually assaulted her. Mother called the police. They instructed her to bag up A.B.'s clothing and bring it to the police station.[2] Mother decided not to take A.B. back to the hospital because A.B. was having an "emotional breakdown." *Id.* at 184.

---

[2] Apparently, no one ever found or admitted finding A.B.'s underwear.

5

The police obtained DNA samples from Walker, A.B., A.B.'s leggings, the back seat of Walker's car, and items recovered from the car. Two samples taken from A.B.'s leggings contained DNA from which Walker could not be excluded as a contributor. One sample was from Area 16, which is located on the *inside* of the right leg of the leggings. State's Ex. 14. The probability that a random person in the African-American population contributed to the DNA mixture in the sample from which Walker could not be excluded was 1 in 2.9 billion. Tr. at 616-17. The DNA expert testified that such a low probability indicated that it would be "somewhat rare to find another individual to be [a] possible contributor." *Id*. at 617-18. The other sample was from Area 18, which is located on the outside front of the leggings somewhat below the waistband. State's Ex. 12. The probability that a random person in the African-American population contributed to the DNA mixture in the sample from which Walker could not be excluded was 1 in 83,000. In addition, the sample taken from the back seat of Walker's car contained DNA from which A.B. could not be excluded as a contributor. The probability that a random person in the African-American population contributed to the DNA mixture in the sample from which A.B. could not be excluded was 1 in 140,000. Tr. at 623 and 624.[3]

---

[3] The State says, "Lab tests revealed that A.B.'s DNA was recovered from Defendant's vehicle and Defendant's DNA was recovered from the waistband of A.B.'s leggings." Appellee's Br. at 6. Walker contends that the State "mischaracterizes the evidence by claiming that A.B.'s DNA was recovered from the vehicle" and that there "was no testimony that Walker's DNA was definitely recovered from A.B.'s leggings." Appellant's Reply Br. at 3. Our review of the record reveals the truth to be somewhere between these positions, as shown by our recitation of the facts. It is unfortunate that neither party accurately described the DNA evidence.

On October 14, 2010, the State charged Walker with class A felony child molesting involving sexual intercourse and class C felony child molesting involving touching or fondling. A four-day jury trial began June 18, 2012. The jury found Walker not guilty of class A felony child molesting but guilty of class C felony child molesting. Walker now appeals. Additional facts will be provided as necessary.

## Discussion and Decision

### *I. Father's Testimony*

At trial, Father testified on direct examination as follows:

Q.      At some point in time did you wake up?

A.      Yes, we did.

Q.      And what happened when you woke up?

A.      It was real late and then we thought about our daughter[].

Q.      Okay.

A.      You shouldn't have done that, man. You shouldn't have done that man. You shouldn't have done that to my daughter.

[The prosecutor]:

     Your Honor? Your Honor—[Father].

Q.      Come on, man. You shouldn't have done that. You took me and my wife's kindness—

[The prosecutor]:

     May we have a recess?

THE COURT:

[Father].

A.     I can't be in here.  I can't do this testimony.

THE COURT:

Just control yourself.

A.     I really can't be in here.  I got to get out of here because I can't–can I leave your courtroom, sir?

[Defense counsel]:

Your Honor, I still have obviously cross-examination as well.

THE COURT:

You can't leave.  Just control your temper, all right?

A.     Yes, sir, I'm sorry.

THE COURT:

Otherwise the bailiffs will control you.

A.     They ain't gonna have to control me because I'm reliving something with my child.

THE COURT:

Would you like to take about a five minute recess?

A.     Come on, right now, let's go.

THE COURT:

Why don't you go with the bailiff for just a few minutes, stand in recess for about five minutes.  The jury will remain right there.

WHEREUPON THE COURT TOOK A SHORT RECESS.

THE COURT:

Ladies and gentlemen, please disregard the recent outburst that you heard there. It was not responsive to any questions, it was a volunteered outburst, so just disregard that outburst and I know all of you can consider how it occurred, so I hope it doesn't happen again. If the defendant is ready we will bring him back in and start questioning.

A.  I would like to apologize for my manners in your courtroom and I would like to apologize to everyone in the courtroom as well.

THE COURT:

Thank you, sir. Proceed. Just answer counsel's questions.

A.  Okay.

Tr. at 197-99.

During cross-examination, defense counsel questioned Father about the manner in which Mother questioned A.B. after she exited Walker's house:

Q.  Was your wife excited?

A.  What do you mean excited?

Q.  Was she upset?

A.  Yeah, she was upset.

Q.  Was she loud?

A.  Was she loud? What do you mean?

Q.  What [sic] she like, "[A.B.], where have you been?" Or was she asking her loudly, and in an excited, upset manner?

A.  She wasn't upset at [A.B.], it's not [A.B.'s] fault.

Q.  I'm just asking you, how she was speaking?

A.  I'm explaining it to you. She was talking to my child, when this happened I was not mean to my daughter because that's–that's more

9

abuse. She's been messed over and abused here and you're gonna take her home and abuse her? You don't do a person like that.

*Id.* at 233.

Defense counsel also questioned Father regarding A.B.'s refusal to submit to a rape kit:

Q. And you remember the hospital personnel asking her, asking to examine her and she said "no"?

A. It was her choice, they said it was her own choice. We could not force her as parents to be examined.

Q. Did you hear her telling them "no"?

A. Yes, she said she didn't want to be examined.

Q. Okay.

A. She just broke down, it's like–it's not a good feeling I guess for a kid to be violated. As an adult, how would you feel if somebody [violates] you? It would take your whole morale–so this is a little kid.

….

Q. Your wife told us that [A.B.] would not–or the hospital would not give [A.B.] a rape kit because [A.B.] never said anybody touched her. But you said that it was an issue of consent, [A.B.] wouldn't let them test her?

A. They asked her did she want to take a test? [A.B.] is the one who has to say "yes". As [a] parent you can't do that. First of all, let me tell you something, if I thought that this individual didn't do nothing, I would be in this court saying this man is innocent. I would never let nobody go through assassinating their character, and assassinating their life, putting a burden like this on them.

*Id.* at 235, 240.

10

Walker argues that Father's testimony violated Indiana Evidence Rule 704(b) and denied him the presumption of innocence to which he is entitled. Walker did not object to the testimony of which he now complains and therefore has waived the issue for appellate review. *See Kubsch v. State*, 784 N.E.2d 905, 923 (Ind. 2003) ("Failure to object at trial to the admission of evidence results in waiver of that issue on appeal."). Moreover, the trial court admonished the jury following Father's outburst. A timely and accurate admonishment is presumed to cure any error in the admission of evidence. *Lay v. State*, 659 N.E.2d 1005, 1009 (Ind. 1995). "'[R]eversible error is seldom found when the trial court has admonished the jury to disregard a statement made during the proceedings.'" *Warren v. State*, 757 N.E.2d 995, 999 (Ind. 2001) (quoting *Bradley v. State*, 649 N.E.2d 100, 108 (Ind. 1995)).

Nevertheless, Walker argues that the trial court's failure to sua sponte order a mistrial was fundamental error. He also claims that defense counsel's failure to object to Father's subsequent comments and move for mistrial resulted in fundamental error. We have said that

> [t]he fundamental error exception is extremely narrow and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. The error claimed must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process. This exception is available only in egregious circumstances.

*Palilonis v. State*, 970 N.E.2d 713, 730 (Ind. Ct. App. 2012), *trans. denied*.

Indiana Evidence Rule 704(b) provides, "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." It is clear that from Father's

11

outburst and his subsequent testimony that he believed Walker was guilty. However, it is unsurprising that Father believed his daughter and experienced intense emotions. We expect that most fathers would experience similar emotions. The trial court acknowledged that the jurors would have such an understanding. *See* Tr. at 199 ("so just disregard that outburst and I know all of you can consider how it occurred."). We agree with the trial court that the jurors would understand this basic human response and presume that the jury followed the court's instruction to disregard Father's remarks. We conclude that the trial court's admonishment cured any error arising from Father's outburst.

As for Walker's argument that Father's subsequent comments rose to the level of fundamental error, we are unpersuaded. These subsequent comments were made during defense counsel's cross-examination. Two of the three comments were responsive to defense counsel's questions and therefore constitute invited error. "'[E]rror invited by the complaining party is not reversible error.'" *Booher v. State*, 773 N.E.2d 814, 822 (Ind. 2002) (quoting *Ellis v. State*, 707 N.E.2d 797, 803 (Ind. 1999)). The first of the comments was in response to defense counsel questions regarding whether Mother was excited, upset, and loud when she talked to A.B. about what had happened. Father replied, "I'm explaining it to you. She was talking to my child, when this happened I was not mean to my daughter because that's–that's more abuse. She's been messed over and abused here and you're gonna take her home and abuse her? You don't do a person like that." Tr. at 233. Father was merely explaining why they would not have been harsh with A.B. The second comment was in response to defense counsel's questioning regarding A.B.'s refusal to submit to a rape kit.

Father testified, "She just broke down, it's like–it's not a good feeling I guess for a kid to be violated. As an adult, how would you feel if somebody [violates] you? It would take your whole morale–so this is a little kid." *Id*. at 235. Father was offering a reasonable explanation as to why A.B. would not agree to the rape kit. As this testimony constituted invited error, it is not reversible error.

Father's last comment, however, was not responsive to defense counsel's questions. He stated, "First of all, let me tell you something, if I thought that this individual didn't do nothing, I would be in this court saying this man is innocent. I would never let nobody go through assassinating their character, and assassinating their life, putting a burden like this on them." Tr. At 240. This testimony clearly violated Indiana Evidence Rule 704(b), but we cannot conclude that it deprived Walker of a fair trial. In addition to Father's testimony, the jury observed and listened to the testimony of A.B., Mother, Walker's wife, Walker's stepdaughters, Keith Woods, five police officers, and two lab technicians. All witnesses were vigorously cross-examined. As discussed earlier, the jury would have understood that Father's statements were influenced by his intense emotional response to the situation. In

fact, the jury acquitted Walker of class A felony child molesting. Accordingly, we conclude that Father's statement did not result in fundamental error.[4]

## *II. Failure to Give Instruction*

At the instruction conference following closing arguments, Walker requested an instruction on sexual battery as a class D felony. The trial court concluded that class D felony sexual battery was a lesser-included offense of class C felony child molesting and stated that it would give the instruction even though defense counsel had not submitted an instruction. However, the following day, the trial court did not provide the jury with an instruction on class D felony sexual battery. Walker did not object to the omission of the instruction.

Walker asserts that the trial court erred in failing to give the class D felony sexual battery instruction. The State asserts that Walker waived his claim by failing to object to the omission of the requested instruction. We agree. *See Treadway v. State*, 924 N.E.2d 621, 633 (Ind. 2010) ("Failure to object at trial waives the issue for review unless fundamental error occurred."). Walker can obtain reversal only by establishing fundamental error, error

---

[4] Walker also asserts that the prosecutor, in closing argument, compounded the error of Father's improper testimony by vouching for Father's belief. *See Gaby v. State*, 949 N.E.2d 870, 880 (Ind. Ct. App. 2011) ("It is inappropriate for a prosecutor to make an argument which takes the form of personally vouching for a witness."). Walker complains that the following statement constitutes improper vouching: "You might question some of their parenting skills, but as you can see, especially coming from [Father], he is tore up about that fact. That he didn't do what he needed to do to protect his little girl." Tr. at 654. The prosecutor merely stated that Father was upset. "A prosecutor may comment on the credibility of the witnesses only if the assertions are based on reasons which arise from the evidence." *Id.* at 881. Acknowledgment of Father's emotional distress is not an endorsement of Father's truthfulness. The prosecutor's comment does not constitute improper vouching. There was no error, let alone fundamental error.

that makes a fair trial impossible or constitutes clearly blatant violations of basic and elementary principles of due process. *Palilonis*, 970 N.E.2d at 730.

When a party requests an instruction on an alleged lesser-included offense, the trial court must use a three-step analysis to determine whether the instruction is appropriate.

> [First], the court must compare the statute defining the crime charged and the statute defining the alleged lesser-included offense. If the alleged lesser-included offense may be established by proof of all of the same or proof of less than all of the same material elements to the crime, or if the only difference between the two statutes is that the alleged lesser-included offense requires proof of a lesser culpability, then the alleged lesser-included offense is inherently included in the crime charged.
>
> [Second], if the trial court determines that the alleged lesser-included offense is not inherently included in the charged crime, it must compare the statute defining the alleged lesser-included offense with the charging instrument in the case. If all of the elements of the alleged lesser-included offense are covered by the allegations in the charging instrument, then the alleged lesser-included offense is factually included in the charged crime.
>
> [Third], [i]f the trial court has determined that the alleged lesser-included offense is either inherently or factually included in the charged crime, … the trial court must examine the evidence presented by each party and determine whether there is a *serious evidentiary dispute* over the element or elements that distinguish the crime charged and the lesser-included offense. If it would be possible for a jury to find that the lesser, but not the greater, offense had been committed, then the trial court must instruct the jury on both offenses.

*Watts v. State*, 885 N.E.2d 1228, 1231-32 (Ind. 2008) (citations omitted).

Walker was charged and convicted pursuant to Indiana Code Section 35-42-4-3(b), which provides,

> A person who, with a child under fourteen (14) years of age, performs or submits to any fondling or touching, of either the child or the older person, with intent to arouse or to satisfy the sexual desires of either the child or the older person, commits child molesting, a Class C felony.

15

Sexual battery is defined in Indiana Code Section 35-42-4-8(a)(1)(A), which provides in relevant part,

> A person who, with intent to arouse or satisfy the person's own sexual desires or the sexual desires of another person touches another person when that person is compelled to submit to the touching by force or the imminent threat of force … commits sexual battery, a Class D felony.

Class D felony sexual battery is not an inherently included offense of child molesting because the sexual battery statute requires a finding that the victim was compelled to submit to the touching by force or imminent threat of force and the child molesting statute does not require this element but does require proof of age. *Compare* Ind. Code § 35-42-4-8(a) *with* Ind. Code § 35-42-4-3; *see also Childs v. State*, 886 N.E.2d 75, 77 (Ind. Ct. App. 2008) (concluding that class D felony sexual battery was not an inherently lesser-included offense of class B felony child molesting).

Class D felony sexual battery is also not a factually included offense of class C felony child molesting as charged. The information for Walker's class C felony molesting charge alleged,

> [O]n or about July 15, 2010, in the County of Lake, State of Indiana, Walker, being at least twenty-one (21) years of age, did knowingly or intentionally perform or submit to any touching or fondling of either [A.B.] or Walker, with intent to arouse or satisfy the sexual desires of either [A.B.] or [Walker] when [A.B.] was a child under fourteen (14) years of age, contrary to I.C. 35-42-4-3 and against the peace and dignity of the State of Indiana.

Appellant's App. at 6. The information does not allege facts including the element of force or imminent use of force as required for class D felony sexual battery. Accordingly, class D felony sexual battery is neither an inherently nor a factually included offense of class C

16

felony child molesting as charged. Because it is neither inherently nor factually included, we do not proceed to the third step of examining the evidence, even though in this case there was evidence that A.B. was compelled to submit to Walker's touching by force.[5] Because class D felony sexual battery is neither inherently nor factually included in class C felony child molesting as charged, there was no error, let alone fundamental error, in the trial court's omission of an instruction on class D felony sexual battery.

### III. Replacement of Juror

At the close of the parties' evidence on June 20, 2012, the trial court instructed the jury to return the following morning at 7:45 a.m. to hear closing arguments so that they could begin deliberating before other scheduled court proceedings began. This was two hours earlier than the three previous mornings.

The following day, Juror 271 was not present at 7:45 a.m. The trial court attempted to contact the juror on his cellphone but was unsuccessful because the juror had provided an incomplete phone number. At 8:22 a.m., the trial court met with the parties in open court, informed them that Juror 271 was not present and could not be reached by cellphone, and that

---

[5] A.B. testified that Walker pushed her into the back seat and pulled off her leggings. She further testified that she told Walker to stop and tried to scream, but Walker covered her mouth with his hand. Thus, there was evidence presented that would have supported the element of touching by force as required by the sexual battery statute. *See* Ind. Code. § 35-42-4-8(a)(1)(A). However, according to the three-step analysis, it is not appropriate to give the jury an instruction on class D felony sexual battery because it is neither an inherently nor a factually included offense as charged. There appears to be a logical anomaly in the current state of the law that does not permit an instruction on an alleged lesser-included offense even when there is evidence in the record to support all the elements of that offense unless requested by the State. Why the State but not the defendant would have exclusive control over this situation is, however, not readily apparent. We are bound to follow the law unless and until our supreme court instructs us otherwise.

the court had decided to replace the juror with an alternate. Defense counsel objected because Juror 271 was the only African-American on the jury. The court stated:

> The truth of the matter is we don't know where the juror is, we don't know if that juror will ever appear. The Court has to proceed[.] [I]t's not a matter of the Court or anyone trying to prejudice your defendant. It just happened. So I'm going to overrule the motion and we will proceed with the jury and juror number 372 will soon be in juror seat three.

Tr. at 649. The parties presented closing arguments. At 9:45 a.m., the jury retired to deliberate. Juror 271 had arrived by then and explained to the trial court that he depended on public transportation and that the bus had broken down three times that morning.[6]

Walker challenges the trial court's decision to replace Juror 271 because Juror 271 was the only black juror on the panel. It is well settled that

> [t]rial courts have significant leeway under Indiana Trial Rule 47(B) in determining whether to replace a juror with an alternate and we will reverse only if there was an abuse of discretion. …. A defendant is entitled as a matter of right only to an impartial jury, Ind. Const. art. I, § XIII, and not to one of his precise choosing where the issue is merely replacing a regular juror with an alternate. Indeed, alternate jurors are presumed to be fair and equally qualified to the task.

*Jervis v. State*, 679 N.E.2d 875, 881-82 (Ind. 1997) (citations omitted).

Essentially, Walker's argument is that he was prejudiced by not having an African-American on the jury, and that if the court had just waited until 9:45 a.m. to begin that day, as it had the three previous days, it would not have had to replace Juror 271 because Juror 271 was in court by then and was blameless. Significantly, Walker does not allege that the replacement of Juror 271 was based on racial discrimination, nor are there any facts present

---

[6] The record is unclear as to precisely when Juror 271 arrived.

18

here that remotely suggest that Juror 271 was replaced due to racial discrimination. Rather, Walker asks us to assume prejudice, saying that he "was prevented from having his fate determined by a properly empaneled jury selected by him for that purpose." Appellant's Br. at 18. We disagree. Indiana Trial Rule 47(B) provides, "Alternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges, shall take the same oath, and shall have the same functions, powers, facilities and privileges as the regular jurors." *See also King v. State*, 508 N.E.2d 1259, 1263 (Ind. 1987). Walker does not argue that his role in selecting the alternate juror was anything less than required by our trial rules. We decline to presume prejudice.

Further, to the extent that Walker's argument relies on the fact that Juror 271 appeared before the end of closing arguments and was blameless, it is based on pure hindsight. At 8:22 a.m., the trial court did not know why Juror 271 was absent, let alone when or whether he would appear. The trial court had sound reasons to proceed. Accordingly, we conclude that the trial court did not abuse its discretion in replacing Juror 271.

Affirmed.

ROBB, C.J. and FRIEDLANDER, J., concur.