

FILED

May 29 2019, 10:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Stacy R. Uliana
Bargersville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

William Hedrick,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

May 29, 2019

Court of Appeals Cause No.
18A-CR-1945

Appeal from the Delaware
Circuit Court

The Honorable Linda Ralu Wolf,
Judge

Trial Court Cause No. 18C03-
1501-F6-1

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, William Hedrick, M.D., (Hedrick), appeals his conviction for three Counts of forgery, Level 6 felonies, Ind. Code § 35-43-5-2(d), and three Counts of registration offense, Level 6 felonies, I.C. § 35-48-4-14(b)(2)(C).

We affirm.

# ISSUES

Hedrick presents four issues on appeal, which we consolidate and restate as the following three issues:

(1) Whether the trial court erred by admitting certain evidence;

(2) Whether the State presented sufficient evidence beyond a reasonable doubt to support Hedrick's convictions; and

(3) Whether the three forgery convictions violate the continuous crime doctrine.

# FACTS AND PROCEDURAL HISTORY

Hedrick is a licensed physician in the state of Indiana. He is also certified by the American Board of Pain Medicine in physical medicine and rehabilitation. In 2008, Hedrick established his own medical practice, where he specialized in pain management, and had several offices, including one in Muncie, Indiana. As his practice grew, Hedrick networked with other doctors. At its peak,

Hedrick's practice had 250 employees and sixteen medical providers, including doctors and nurse practitioners.

[5] On February 28, 2013, and March 28, 2013, the Indiana Medical Licensing Board (the Board), held a hearing concerning a disciplinary complaint filed against Hedrick. On April 2, 2013, the Board issued a detailed Order that found three violations of Indiana Code section 25-1-9-4. Specifically, the Board concluded that Hedrick had violated: (1) I.C. § 25-1-9-4(a)(4)(A)(ii) when he failed to keep abreast with current practices when he administered steroid injections beyond what has been deemed medically acceptable; (2) I.C. § 25-1-9-4(a)(4)(B) when he failed to apply current theories of appropriate pain management to the treatment of his patients; and (3) I.C. 25-1-9-4(a)(4)(B) when he failed to adequately supervise his nurses and physician assistants. Because of these violations, the Board placed Hedrick's medical license on indefinite probation, and it established a list of terms and conditions that included monthly reporting, continuing training, and a fine.

[6] A medical practitioner who holds a registration number issued by the United States Department of Justice, Drug Enforcement Administration (DEA), and a Controlled Substance Registration license issued by the state of Indiana, may prescribe "Schedule II through V drugs" to patients. (Transcript Vol. II, p. 204).

[7] In October 2013, Anita Doctor (Doctor), a nurse practitioner, began working at Hedrick's practice. Doctor primarily saw patients for pain management

treatment, including "prescribing opioid pain medication." (Tr. Vol. II, p. 206). In mid-November 2013, Doctor witnessed two other nurse practitioners writing prescriptions for patients seen by Hedrick, but whom they had not seen themselves. Before leaving Hedrick's practice in April 2014, Doctor had observed several instances where patients were receiving opioids without going through a substance-abuse screening procedure. She also noted that several patients "receiv[ed] more than 60 morphine equivalents a day," which under Indiana and federal guidelines, requires close monitoring of the patient. (Tr. Vol. II, p. 211). When Doctor attempted to wean those patients from the pain medication by prescribing muscle relaxers or nerve medications, those patients would try to see another nurse practitioner. Doctor also witnessed a nurse practitioner sign a prescription and hand it to Hedrick, who then gave it to a patient. When Doctor inquired about that anomaly, she learned that Blue Cross Blue Shield insurance company would not reimburse patients seen or treated by Hedrick. The practice also posted a list of all the insurance companies that would not reimburse Hedrick.

[8]     After Doctor left Hedrick's practice, Doctor learned that employees from Hedrick's practice continued to use her name and DEA registration number to prescribe controlled substances. Specifically, on May 1, 2014, someone other than Doctor signed two prescriptions, one for Morphine and one for Percocet; on May 8, 2014, someone other than Doctor signed a prescription for Morphine that listed Doctor's credentials; and on November 26, 2014, someone other than Doctor called in a prescription for Tramadol at Walgreens.

[9]     In November 2013, Elisabeth Buchanan (Buchanan), a nurse practitioner, began working at Hedrick's practice. Each week, she operated as a nurse for four days, and for the remaining day, she was the chief operating officer. In December 2013, Buchanan learned that Hedrick's practice was in financial trouble. For instance, Buchanan learned that Fifth Third Bank was considering calling a note due, and that Hedrick had hired a consulting firm to look at the practice's financial books so as to improve the stability of the organization. The consulting firm sent an email to Hedrick's staff stating that the practices of the chief finance officer, Greg Lutz (Lutz), should be lauded since he had renegotiated monthly payments to American Express down to $5,000 a month from $25,000. In January 2014, Buchanan indicated to Hedrick that she wanted to resign, but she later changed her mind.

[10]    On August 26, 2014, at approximately 8:00 a.m., Buchanan sent an email to Hedrick and a few other staff members, expressing concern that other people were using her "DEA# . . . for numerous prescriptions [] both scheduled and unscheduled," drugs that she had not specifically prescribed. (State's Exh. Vol. II, p. 175). Buchanan also raised a concern that one patient who had a history of mental illness and whom she had seen on June 14, 2014, had thereafter been seen by two other nurses in a span of five weeks and had been prescribed a total of "330 oxycodone." (State's Exh. Vol. II, p. 176). When Buchanan received no response to her email, at around 10:00 a.m., she wrote to the entire clinical staff and stated

I just wanted to take a moment and ask that everyone PLEASE check the prescription for which you are signing and make sure they are yours.

I have had over [fifteen] patients alone in the last week that were not or have ever been seen by me or prescribed medications by me; however, they are ending up on INSPECT[1] or in the computer that I have prescribed medications to them. Some have shown [two] providers have wrote [sic] scripts on the same day. I am not sure if it is a computer issue or what; but if you could please double check as you sign them, or they are printed it would be appreciated.

(State's Exh. Vol. II, p. 177). When Hedrick did finally respond to Buchanan's emails, he told her that the situation was due to a flaw with the INSPECT program. The following day, Buchanan resigned. On September 9, 2014, which was after Buchanan left Hedrick's practice, someone other than Buchanan signed a prescription for Percocet that listed Buchanan's name and Buchanan's DEA registration number. Buchanan was in Texas on that date.

[11] In the Fall of 2014, Hedrick was the target of a criminal investigation by the DEA after local pharmacies in Muncie reported Hedrick's practice. Specifically, the pharmacies informed the DEA that the total volume of

---

[1] The Indiana Scheduled Prescription Electronic Collection and Tracking program (INSPECT) was designed to serve as a tool to address the problem of prescription drug abuse and diversion in Indiana. By compiling controlled substance information into an online database, INSPECT performs two critical functions: (1) maintains a clearinghouse of patient information for health care professionals; and (2) provides an important investigative tool for law enforcement. *See* About INSPECT, IN.gov, http://www.in.gov/pla/inspect/ (last visited Apr. 30, 2019).

"controlled substance prescriptions being prescribed out of [Hedrick's] . . . medical practice" was alarming. (Tr. Vol. II, p. 128). The pharmacies indicated that Hedrick's clinic was prescribing "dangerous combinations of controlled substances," *i.e.*, "narcotics . . . with anti-depressant." (Tr. Vol. II, p. 128). Some other pharmacies had altogether stopped filling prescriptions from Hedrick and his practice. Following those complaints, the DEA conducted surveillance of Hedrick's practice in Muncie in August and October of 2014.

[12] On September 2, 2014, Hedrick's chief financial officer, Lutz, sent a message to Hedrick stating, "To make payroll, I will need 60k. To pay all critical vendors I will need additional 20k." (State's Exh. Vol. II, p. 186). Over a series of several texts, Hedrick wrote back stating, "Wow! . . . Need to do some extreme stuff to stop this . . . Need to meet with you tomorrow night . . . Have to stop the hemorrhaging now . . . Can't spend more than we have . . . We have a crisis." (State's Exh. Vol. II, p. 186). The following day, Lutz and Hedrick exchanged several text messages, and Hedrick angrily wrote back,

> This isn[']t about you. This is about survival of the company and vital nature of cash flow. Several heads are better than one. We might have to renegotiate payment plans. Might have to stop paying American [E]xpress. Might try breaking up payments to others. Can [sic] afford to pay that much in one week. May have to not pay lawyers.

(State's Exh. Vol. II, p. 187).

[13] That same month, the DEA interviewed three nurse practitioners from Hedrick's practice. They included Gay Watson (Watson), Susan Adam-Hayes

(Adam-Hayes), and Sarah Nevil (Nevil). The nurses thereafter surrendered their respective DEA registration numbers. Despite the fact that Watson had surrendered her DEA registration number, Hedrick used it to issue the following prescriptions: (1) on October 2, 2014, two prescriptions, one for 120 tablets of Norco and another for 90 tablets of Percocet; and (2) on October 16, 2014, a prescription for 120 tablets of Percocet.

[14] On October 20, 2014, the DEA executed a warrant at Hedrick's Muncie office. The DEA also seized several patient records from Hendrick's practice. During their course of investigation, the DEA discovered that additional prescriptions had been written using Watson's suspended DEA registration number. The DEA also subpoenaed the three prescriptions in question from the pharmacies where they had been filled.

[15] On January 6, 2015, the State filed an Information, charging Hedrick with three Counts of forgery, Level 6 felonies, and three Counts of registration offense, Level 6 felonies. For the forgery offenses, the State alleged that Hedrick had used Watson's name and DEA registration number for three separate prescriptions. For the registration offenses, the State alleged that Hedrick, "knowingly or intentionally distributed controlled substances with a federal or state registration number that is fictitious, revoked, suspended or issued to another person." (Appellant's App. Vol. II, p. 40). A four-day jury trial was held, beginning on June 11, 2018. At the close of the evidence, the jury found Hedrick guilty as charged. On August 9, 2018, the trial court conducted a sentencing hearing and sentenced Hedrick to serve concurrent two-year terms

for each offense in the Department of Correction, all to be served through electronic home detention.

Hedrick now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Admission of the Evidence*

The admission or exclusion of evidence falls within the sound discretion of the trial court, and its determination regarding the admissibility of evidence is reviewed on appeal only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Doolin v. State*, 970 N.E.2d 785, 787 (Ind. Ct. App. 2012).

## A. *Hearsay*

Hedrick argues that Buchanan's, Doctor's, and a DEA agent's testimony that local pharmacies had stopped filling prescriptions written by Hedrick and other medical providers in his practice, as well as the fact that insurance companies had stopped reimbursing Hedrick, was hearsay evidence and the trial court abused its discretion by admitting that evidence.

Hearsay is an out-of-court statement offered for "the truth of the matter asserted," and it is generally not admissible as evidence. Ind. Evidence Rule 801(c)(2), 802. "Whether a statement is hearsay will most often hinge on the purpose for which it is offered." *Blount v. State*, 22 N.E.3d 559, 565 (Ind. 2014) (quoting *United States v. Linwood*, 142 F.3d 418, 425 (7th Cir. 1998)).

### 1. *DEA Agent*

[20] At Hedrick's trial, a DEA agent testified that after Hedrick's license had been placed on probation, the DEA began receiving complaints pertaining to Hedrick's practice. When asked to describe the complaints, Hedrick's counsel interjected and stated, "Objection for hearsay purposes. Go ahead." (Tr. Vol. II, p. 128). The trial court did not issue a ruling on Hedrick's objection, and the DEA agent proceeded to testify as follows:

> The complaints focused primarily on the concerns that the local pharmacies had regarding the total number of prescriptions being, controlled substance prescriptions being prescribed out of his business entity, his medical practice, by him and his employees and the dangerous combinations of controlled substances being prescribed.

(Tr. Vol. II, p. 128). While it appears from the above excerpt that Hedrick objected to the evidence, he did not give the trial court the opportunity to evaluate the purpose of the statements which he now alleges to be inadmissible hearsay or to consider the applicability of exceptions to the hearsay rule. The failure to object at trial waives any claim of error and allows otherwise inadmissible hearsay evidence to be considered for substantive purposes. *Scott v. State*, 803 N.E.2d 1231, 1238 (Ind. Ct. App. 2004). Accordingly, Hedrick waives this issue for appellate review.

### 2. *Buchanan and Doctor*

[21] During Doctor's testimony that local pharmacies had stopped filling prescriptions written by Hedrick and that insurance companies were not

reimbursing Hedrick for any patients seen by him, the following exchange occurred between Doctor and the State:

> [State]: Were you familiar or were you aware, during your employment, of occasions where insurance companies were refusing to reimburse Doctor Hedrick?
>
> [Doctor]: Yes.
>
> [Hedrick's Counsel]: Objection, Your Honor. It calls for hearsay.
>
> [State]: I don't think it calls for hearsay, Judge. I think it's just calling for what her general knowledge of that, of what is going on inside the practice.
>
> [Hedrick's Counsel]: If I understood, it was a question regarding insurance--
>
> [Trial Court]: Regarding insurance[?]
>
> [Hedrick's Counsel]: Yes, regarding insurance, I mean, that's the insurance company's, if you will, for lack of a better term, statement that they are going to pay a bill or are they not going to pay a bill that's the insurance company's affirmative statement. It's not for Ms. Doctor to testify to, it's for the insurance company to testify to so that would be hearsay.
>
> [Trial Court]: . . . [State]?
>
> [State]: Judge, I don't believe we are admitting that for the truth of the matter asserted. If we, if we accept that it's hearsay, I'm just asking her whether or not she was [sic] knowledge of that

and then my follow up question's going to be kind of what was taking place in regard[] to that being the situation inside that practice.

[Trial Court]: The objection is overruled, you may answer the question.

[Doctor]: Yes, I was made aware of that.

[State]: And were there, were there steps being taken to kind of, not counteract that, but to get around the fact that insurance companies were no longer reimbursing you?

[Doctor]: In November when I saw that an individual would sign a prescription and then hand it to Doctor Hedrick who would hand it to the patient, I asked about it and at that time I was told that he could not see and treat Blue Cross Blue Shield patients and that they were Blue Cross Blue Shield patients.

[State]: Were there listings up in the office about what insurance companies [Hedrick] could see and could not see?

[Doctor]: Yes.

(Tr. Vol. II, pp. 214-17). As for Buchanan's testimony relating to the same, Hedrick again objected on hearsay grounds. When the trial court asked the State to respond to Hedrick's hearsay objection, the following dialogue occurred:

[The State]: Judge, this testimony that Ms. Buchanan's about to testify is not being offered for the truth of the matter, it's being offered for the reasons that different steps were taken within the

practice, her knowledge within the practice and the time she was employed there goes to that.

[Trial Court]: The [o]bjection's [sic] overruled . . . .

[Hedrick's Counsel]: If I could make one request, Your Honor, if that is what's coming in . . . [is] the same thing [that] was testified to by Ms. Doctor, [] I guess [] I would call a curative instruction to the jury as far as it's not to be considered for the truth, but rather--

[Trial Court]: An explanation of the process in the office?

[Hedrick's Counsel]: Yes.

[Trial Court]: So, [m]embers of the [j]ury, basically, I'm instructing you to consider this particular evidence as evidence of the process in the office and you are not to use it to actually ultimately make a decision about whether [Hedrick] is guilty or not guilty. It's just, it's a process, or excuse me, it's evidence to help you understand the general process in the office. Go ahead.

(Tr. Vol. II, p. 247).

[22] Hedrick argues, trial court's admonishment did not cure any resulting prejudice. We disagree. A trial court's timely and accurate admonishment to the jury is presumed to cure any alleged error in the admission of evidence. *See Walker v. State*, 988 N.E.2d 341, 347 (Ind. Ct. App. 2013), *trans. denied*. Because the trial court admonished the jury and directed the jury to focus on the fact that Buchanan's and Doctor's testimonies were in relation to their knowledge of the internal operations of Hedrick's practice, we conclude that it cured any

prejudice or potential for unfair harm arising from the statements. Accordingly, we find no error here.

## II. *Sufficiency of the Evidence*

[23] Hedrick claims that there was insufficient evidence to convict him of the three Counts of Level 6 felony forgery, and the three Counts of Level 6 felony registration offense. When reviewing a claim of insufficient evidence, it is well established that our court does not reweigh evidence or assess the credibility of witnesses. *Walker v. State*, 998 N.E.2d 724, 726 (Ind. 2013). Instead, we consider all of the evidence, and any reasonable inferences that may be drawn therefrom, in a light most favorable to the verdict. *Id.* We will uphold the conviction "'if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *Id.* (quoting *Davis v. State*, 813 N.E.2d 1176, 1178 (Ind. 2004)).

## A. *Forgery*

[24] Indiana Code section 35-43-5-2(d) provides that "a person who, with intent to defraud, makes, utters, or possesses a written instrument in such a manner that it purports to have been made: (1) by another person; (2) at another time; (3) with different provisions; or (4) by authority of one who did not give authority; commits forgery, commits forgery, a Level 6 felony." The only element Hedrick contends that the State failed to prove beyond a reasonable doubt is the intent to defraud prong.

[25] "Proof of intent to defraud requires a showing that the defendant demonstrated 'intent to deceive and thereby work a reliance and injury.'" *Bocanegra v. State*, 969 N.E.2d 1026, 1028 (Ind. Ct. App. 2012), *trans. denied* (quoting *Wendling v. State*, 465 N.E.2d 169, 170 (Ind. 1984)). Because intent is a mental state, the fact-finder often must "resort to the reasonable inferences based upon an examination of the surrounding circumstances to determine" whether—from the person's conduct and the natural consequences therefrom—there is a showing or inference of the requisite criminal intent. *Diallo v. State*, 928 N.E.2d 250, 253 (Ind. Ct. App. 2010). In making this determination, the fact-finder looks to the person's conduct and the natural consequences therefrom. *Brown v. State*, 64 N.E.3d 1219, 1232 (Ind. Ct. App. 2016), *trans. denied.*

[26] The State presented evidence that Hedrick's pattern of conduct at his practice, supported the conclusion that Hedrick did not make a mistake when he signed the three prescriptions bearing Watson's name and DEA registration number; but rather, that it was part of his business practice. The State presented evidence of several other instances where Hedrick or members of his staff signed prescriptions using someone else's name and DEA registration number. State's Exhibits 43, 44, and 45, bearing Buchanan's name and DEA registration number were signed by someone other than Buchanan. Buchanan was in Texas when Exhibit 43 was signed. Buchanan testified that after she left Hedrick's practice, there were several prescriptions called in using her name. State's Exhibits 46 through 48 had Doctor's name and DEA registration number at the top, but those prescriptions had not been signed by Doctor.

Finally, State's Exhibit 58, bore Nevil's name and DEA registration number. Nevil was one of the three nurse practitioners who had been questioned by the DEA and had surrendered her DEA registration number, yet, a prescription with Nevil's name and DEA number was issued after Nevil surrendered her DEA registration number and was no longer working at Hedrick's practice.

[27] Even though Watson had surrendered her DEA registration number in September 2014, which meant that she could not prescribe controlled drugs, she remained employed at Hedrick's practice. Hedrick testified that daily, he would treat 30 patients. However, the INSPECT report showed that on October 2, 2014, Hedrick saw 85 patients and issued 140 prescriptions. Then on October 16, 2014, Hedrick saw 92 patients and wrote 148 prescriptions for those patients. Two prescriptions issued on October 2, 2014, which bore Watson's name in print and DEA registration number, had been signed by Hedrick. An additional prescription issued on October 16, 2014, bearing Watson's name in print and DEA registration number, had been signed by Hedrick.

[28] The procedure of writing a prescription at Hedrick's practice entailed the following: After a patient was seen, a doctor or nurse practitioner would instruct a medical assistant who, in turn, would generate a prescription and print it out. The prescribing doctor or nurse practitioner would then review the prescription, verify the patient's name, the dosage units, and sign it before giving it to the patient. Hedrick's contention on appeal is that he mistakenly believed that he was signing his name to his own prescriptions, and not Watson's, lacks merit. Hedrick assigned that error to the medical assistants at

his practice, claiming that the medical assistants must have generated the wrong prescription, which he mistakenly signed. Notwithstanding his assertion, throughout the trial, witnesses reiterated that it is the prescriber's duty to ensure that all components of a prescription are correct.

[29] In addition, we find that the fact that Hedrick's practice was undergoing financial trouble would also have explained to the jury why Hedrick took the risk of using an invalid DEA registration number. The evidence in the record shows that after the Board placed Hedrick's license on indefinite probation on April 2, 2013, several restrictions were put in place. Hedrick's practice thereafter began facing severe financial cash-flow problems. For instance, in December 2013, Fifth Third Bank requested that Hedrick hire a consulting firm to improve the stability of the organization. At trial, Hedrick admitted that his practice was undergoing financial stress. In September 2014, a month before Hedrick signed the prescriptions that are the subject of this case, Hedrick's chief financial officer, Lutz wrote a text to Hedrick stating that the practice needed $60,000 to make payroll, and an additional $20,000 to pay critical vendors. Hedrick was shocked by the request, and over a series of several texts, Hedrick wrote back stating, "Wow! . . . Need to do some extreme stuff to stop this . . . Need to meet with you tomorrow night . . . Have to stop the hemorrhaging now . . . Can't spend more than we have. . . We have a crisis." (State's Exh. Vol. II, p. 186).

[30] Here, the jury could have reasonably concluded that amid the financial struggles of the practice, Hedrick took risks that he otherwise would not have,

*i.e.*, applying a signature to prescriptions purporting to be written by Watson. Further, as discussed above, we note that the prescriptions bearing Watson's credentials and signed by Hedrick were not isolated occurrences; they were part of a larger pattern of Hedrick's practice. Accordingly, we conclude that the State proved beyond a reasonable doubt that Hedrick committed three Counts of forgery when he signed three separate prescriptions which bore Watson's name, and her suspended DEA registration number.

### B. *Registration Offense*

[31] For the registration offenses, Indiana Code section 35-48-4-14(b)(2) provides that a person who knowingly or intentionally uses in the course of the: (A) manufacture of; (B) the financing of the manufacture of; or (C) distribution of; a controlled substance with a federal or state registration number that is fictitious, revoked, suspended, or issued to another person; commits a Level 6 felony.

[32] "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so[;]" and a "person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." I.C. § 35-41-2-2(a)-(b). Federal regulations require that the medical practitioner's DEA registration number be listed on any prescription. *See* 21 C.F.R. § 1306.05.

[33] Hedrick argues, "there is no logical reason for [him] to sign his own name to a surrendered DEA number. But beyond that, the State's own evidence proves that it is an easy mistake to make." (Appellant's Br. p. 22). Contrary to his

assertion, Hedrick testified that he was aware that Watson had surrendered her DEA registration number in October 2014. Further, uncontroverted evidence was presented that prescription forms for controlled substances must bear the prescriber's name, DEA registration number, and must also be signed by the prescriber. As the prescribing doctor, Hedrick should have checked the prescription forms and ensured that all aspects were accurate.

[34] Hedrick then suggests that it would be illogical for him to prescribe controlled substances under someone else's surrendered DEA registration number because a pharmacist would not fill it. This argument lacks merit. First, the three prescriptions that had Watson's name and her surrendered DEA registration number were successfully filled at pharmacies. Further, the DEA agent who testified at Hedrick's trial stated that once a DEA registration number has been surrendered, the DEA monitors its activity to ensure that the number is not used for prescribing controlled substances. Contrary to Hedrick's assertion, if it were impossible for prescribers to use an invalid DEA registration number, there would be no reason for the DEA to further investigate. In light of the foregoing, we conclude that the State proved beyond a reasonable doubt that Hedrick committed the registration offenses.

### III. *Continuous Crime Doctrine*

[35] Hedrick argues that two of his forgery convictions should be vacated under the continuous crime doctrine. The continuous crime doctrine defines those instances where a defendant's conduct amounts only to a single chargeable crime and prevents the State from charging a defendant twice for the same

continuous offense. *Koch v. State*, 952 N.E.2d 359, 373 (Ind. Ct. App. 2011), *trans. denied*. The doctrine "essentially provides that actions that are sufficient in themselves to constitute separate criminal offenses may be so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction." *Id.* (citation omitted). The doctrine applies in those situations where a defendant is charged multiple times with the same offense. *Id.* The continuous crime doctrine does not seek to reconcile the double jeopardy implications of two distinct chargeable crimes; rather, it defines those instances where a defendant's conduct amounts only to a single chargeable crime. *Hines v. State*, 30 N.E.3d 1216, 1219 (Ind. 2015). The continuous crime doctrine requires a fact-sensitive analysis. *Chavez v. State*, 988 N.E.2d 1226, 1229 (Ind. Ct. App. 2013), *trans. denied.* We turn to whether Hedrick's actions of signing three prescriptions bearing Watson's name and DEA registration number were sufficiently compressed in terms of time, place, singleness of purpose, and continuity of action so as to constitute a single transaction for purposes of the continuous crime doctrine. *See Koch*, 952 N.E.2d at 373.

[36]     "The purpose [of the continuous crime doctrine] is to prevent the State from charging a defendant twice for the same continuous offense." *Firestone v. State*, 838 N.E.2d 468, 472 (Ind. Ct. App. 2005). In *Firestone*, this court held that the crimes of rape and criminal deviate conduct were not continuous, but separate and distinct crimes when the defendant raped the victim, and then forced her to perform oral sex on him. *Id.*

[37] Further, we find that our decision in *Benson v. State*, 73 N.E.3d 198, 203 (Ind. Ct. App. 2017), *trans. denied*, demonstrates the purpose of the continuous crime doctrine. In *Benson*, this court found "the evidence indicates that, over the course of ninety seconds, Benson shot a gun at Officer Geiger on two occasions during the brief, continuous pursuit. Under these circumstances, the continuous crime doctrine applies, and Benson could be properly charged with only one count of attempted murder, not two counts." *Id.*

[38] Under the continuous crime doctrine, Hedrick is requesting us to vacate Count II and III. We acknowledge that Hedrick was charged with the same criminal offenses in Count I through III; however, we reject Hedrick's argument that Count II and III constituted the same "continuous" offense. The charging Information outlines that Hedrick's forgery charges in Count I and II were for the prescriptions he signed on October 2, 2014, bearing Watson's name and her suspended DEA registration number. In Count III, the State alleged that Hedrick had committed a similar forgery offense two weeks later, on October 16, 2014.

[39] Looking at the continuity element of the crime doctrine, the State presented evidence that Hedrick signed one prescription on October 2, 2014, and two weeks later, Hedrick signed another prescription on October 16, 2014. These prescriptions were for different patients. The continuity of Hedrick's actions—signing two different prescriptions for two different patients seen at separate times and bearing Watson's name and suspended DEA registration number—does not negate the fact that the acts were separate criminal acts, accomplished

by Hedrick's separate actions. Accordingly, we conclude that Hedrick's convictions do not violate the continuous crime doctrine.

## CONCLUSION

[40]  Based on the foregoing, we conclude that the trial court did not commit error by admitting hearsay evidence. Also, we conclude that the State presented sufficient evidence beyond a reasonable doubt to support Hedrick's conviction; and his convictions do not violate the continuous crime doctrine.

[41]  Affirmed

[42]  Bailey, J. and Pyle, J. concur